In re Judicial Hospitalization of Carol HELVENSTON,

Leon S. JOYNER, Superintendent, Middle Tennessee Mental Health Institute, Petitioner-Appellee,

v.

Carol HELVENSTON, Respondent-Appellant.

Court of Appeals of Tennessee, Western Section, at Nashville.

Feb. 11, 1983.

Application for Permission to Appeal Denied by Supreme Court Aug. 1, 1983.

---

3. *Damian v. Hernon,* 102 Pa.Super. 539, 157 A. 520 (Pa.Super.1931).

Lawrence Sanders, Nashville, for petitioner-appellee.

Sue Boyd Cain, Nashville, for respondent-appellant.

CRAWFORD, Judge.

Carol Helvenston was committed to the Middle Tennessee Mental Health Institute (MTMHI) by order of the Circuit Court of Davidson County filed November 11, 1981, pursuant to the procedure for judicial hospitalization in Tenn.Code Ann. § 33–604 (Cum.Sup.1982). Through court-appointed counsel, Helvenston has appealed the commitment order, asserting violations of her federal constitutional rights. Three issues have been presented for review:

1. Whether Helvenston's discharge from MTMHI has rendered her appeal moot;

2. Whether the Fifth Amendment privilege against self-incrimination applies to statements made by Helvenston to an examining psychiatrist in a judicial hospitalization proceeding;

3. Whether or not the Respondent [Helvenston] was denied the right to confront the witnesses against her when hearsay testimony was permitted through application of the Uniform Business Records as Evidence Act [Tenn.Code Ann. § 24–7–111 (1980)].

### FACTS

Since she experienced her first psychotic episode at the age of 15, Helvenston has been treated in hospitals in Tennessee, Arkansas and New Jersey. On May 4, 1981, Helvenston voluntarily admitted herself to the MTMHI. At the time of her admittance she was 26 years old and was a resi-

dent of Arkansas. She was diagnosed as acutely psychotic.

On November 10, 1981, the superintendent of the MTMHI filed a petition pursuant to Tenn.Code Ann. § 33–604 (Cum.Sup. 1982), to judicially hospitalize Helvenston after she had requested to be discharged against the advice of her doctors. The petition was supported by statements from two doctors from the MTMHI who were familiar with Helvenston and who believed her to be "delusional, quite paranoid, and dangerous to herself and others." Counsel was appointed by the court to represent Helvenston, and a hearing was held on November 24, 1981.

At the hearing, the Trial Court overruled Helvenston's motion to suppress the testimony of the examining psychiatrist on the grounds that such testimony was obtained without the benefit of *Miranda* -type [1] warnings and that its admission would therefore violate Helvenston's Fifth Amendment privilege against self-incrimination. Helvenston's hearsay objection to the psychiatrist testifying from Helvenston's hospital records was also overruled.

On December 11, 1981, the court entered an order directing Helvenston's judicial hospitalization. Helvenston was discharged on January 11, 1982, but on September 22, 1982, she was readmitted to the MTMHI pursuant to Tenn.Code Ann. § 33–603 (Cum.Sup.1982). She was discharged again on September 28, 1982.

### MOOTNESS

■ The superintendent of MTMHI asserts that Helvenston's discharge from MTMHI on September 28, 1982 renders her appeal moot. We disagree. In *Dockery v. Dockery,* 559 S.W.2d 952 (Tenn.App.1977), the court discussed the public interest exception to the mootness doctrine and stated:

It is not easy to state any hard and fast rules by which questions which are of sufficient public interest to justify refusal to dismiss an appeal which has become

moot... However, the starting point is to determine the meaning of 'public interest.' Generally, public interest 'means something more than that the individual members of the public are interested in the decision of the appeal from motives of curiosity or because it may bear upon their individual rights or serve as a guide for their future conduct as individuals.' 132 A.L.R. 1189. The types of issues the courts are likely to resolve despite their mootness are:

\*    \*    \*    \*    \*    \*

(7) questions which must necessarily become moot before the appeal can be heard. *Id.* at 955.

Based upon Helvenston's history of hospitalization for brief periods, she could easily be involuntarily hospitalized and released again before another appeal could be brought.

In *Doe v. Colautti,* 592 F.2d 704 (3d Cir. 1979), the United States Court of Appeals for the Third Circuit was presented with a claim of mootness where a psychiatric patient had been discharged before his appeal could be heard. In discussing the limits of the "capable of repetition, yet evading review" doctrine, the court observed:

It is true that future hospitalization might last long enough to permit review of Doe's statutory and constitutional claims, but his erratic past, from hospitalization to discharge to hospitalization again, supports the prediction that his claims in the future may well continue to escape review. *Id.* at 707.

Although the plaintiff in *Doe v. Colautti* was seeking declaratory and injunctive relief, we feel that the Third Circuit's reasoning is applicable here.

In *In re Ballay,* 482 F.2d 648 (D.C.Cir. 1973), an inmate who had been civilly committed was discharged while his appeal was pending. In holding that his appeal was not moot, the United States Court of Appeals for the District of Columbia stated:

---

1. *Miranda v. State of Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Fifth Amendment privilege is applicable to the states under the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

... Appellant has now been civilly committed on three separate occasions, and each confinement was less than five months in duration. In light of his fixed delusions and the testimony indicating the likelihood of their persistence, the prospect of his again being subjected to commitment is not so remote as to bar the present challenge. *Id.* at 651.

The court there relied on the capable of repetition yet evading review doctrine, and it also placed heavy emphasis on the collateral consequence of civil commitment. *Id.,* at 651–653; *see also Commonwealth ex rel. Bielat v. Bielat,* 257 Pa.Super. 446, 390 A.2d 1321, 1322 (1978) (appeal by a person who voluntarily admitted himself to state mental hospital and who was later the subject of an involuntary commitment proceeding was not moot even though he had been discharged from the hospital while the appeal was pending).

In *Meisel v. Kremens,* 405 F.Supp. 1253 (E.D.Pa.1975), an inmate of a state mental health facility challenged a Pennsylvania statute on constitutional grounds. The court was of the opinion that the inmate's release did not render the action moot because he could at any time have been recommitted pursuant to the challenged statute. *Id.* at 1254 n. 2.

A group of individuals who had been confined in state mental institutions prior to determinations that they should be legally committed to such institutions were denied class certification by the Minnesota Supreme Court, and the court also found that no collateral consequences had been shown to prevent their claim from becoming moot on these grounds in *State ex rel. Doe v. Madonna,* 295 N.W.2d 356 (Minn. 1980). The court still held that the petitioners' action was not moot under the capable of repetition, yet evading review doctrine, because they had been denied their freedom as a direct result of governmental action.

Considering Helvenston's history of hospitalization for her mental disorders, her appeal has not been rendered moot as a result of her latest discharge from MTMHI. Indeed, she has already been discharged, readmitted, and discharged again during the pendency of this appeal alone.

## FIFTH AMENDMENT PRIVILEGE AGAINST SELF–INCRIMINATION

Helvenston maintains that the Fifth Amendment privilege against self-incrimination applies in judicial hospitalization [2] proceedings and that as a result, the testimony of the state psychiatrist concerning her statements made to the psychiatrist in examination and treatment should be suppressed because she was not informed that such statements could be used against her.

Although the question of whether the Fifth Amendment privilege against self-incrimination is applicable in a judicial hospitalization proceeding is one of first impression in Tennessee, a surprising number of other jurisdictions have ruled on the same or similar issue with varied results. Three federal district courts [3], including one three-judge panel, have held that the privilege applies in a civil commitment proceeding, while at least one federal district court has held that the privilege does not apply.[4]

A clear majority of the state courts that have ruled on the question, have held that

---

**2.** Tenn.Code Ann. § 33–604 (Cum.Sup.1982), employs the term "judicial hospitalization" and avoids the pitfalls of using such terms as involuntary civil commitment or nonconsensual civil commitment.

**3.** *Tyars v. Finner,* 518 F.Supp. 502 (C.D.Cal. 1981); *Suzuki v. Quisenberry,* 411 F.Supp. 1113 (D.Hawaii 1976); *Lessard v. Schmidt,* 349 F.Supp. 1078 (E.D.Wis.1972) (three-judge court), *remanded for more specific order,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), *order on remand,* 379 F.Supp. 1376 (E.D.Wis. 1974), *vacated and remanded,* 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), *reinstated on remand,* 413 F.Supp. 1318 (E.D.Wis.1976). A three-judge panel in *Lynch v. Baxley,* 386 F.Supp. 378, 394 (M.D.Ala.1974), held the privilege applicable but it is unclear whether its holding was anything more than a reaffirmation of *Murphy v. Waterfront Commission,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

**4.** *French v. Blackburn,* 428 F.Supp. 1351 (M.D. N.C.1977), *summarily affirmed,* 443 U.S. 901, 99 S.Ct. 3091, 61 L.Ed.2d 869 (1979).

the Fifth Amendment privilege against self-incrimination does not apply in an involuntary civil commitment proceeding.[5]

The seminal case applying the Fifth Amendment privilege against self-incrimination to proceedings other than criminal prosecutions is *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). In *Gault,* the United States Supreme Court held that a juvenile was entitled to the Fifth Amendment privilege against self-incrimination as part of the Fourteenth Amendment right to due process of law in a juvenile delinquency proceeding. In sweeping language, the court rejected the notion that by merely labeling a procedure "civil" a state could avoid applying the privilege against self-incrimination which is expressly reserved for criminal proceedings by the Fifth Amendment. U.S. Const.Amend. V. Rather, the court said:

> ... [T]he availability of the privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites. The privilege may, for example, be claimed in a civil or administrative proceeding, if the statement is or may be inculpatory...

In those States juveniles may be placed in or transferred to adult penal institutions after having been found 'delinquent' by a juvenile court. For this purpose, at least, commitment is a deprivation of liberty. It is incarceration against one's will, whether it is called 'criminal' or 'civil.' And our Constitution guarantees that no person shall be 'compelled' to be a witness against himself when he is threatened with deprivation of his liberty—a command which this court has broadly applied and generously implemented in accordance with the teachings of the history of the privilege and its great office in mankind's battle for freedom.

*Id.* 387 U.S. at 49–50, 87 S.Ct. at 1455–56 (footnotes omitted).

While the United States Supreme Court has declined to rule on the question[6], Helvenston's theory is not without some support. In the *Gault* opinion itself, the court alluded to the involuntary civil commitment of the mentally ill[7]. The extension of the *Gault* rationale to the involuntary civil commitments has been described in the following manner:

> Despite the occasional questioning of judge and commentator, nomenclature has been the dominant justification for

**5.** *In re Matthews,* 46 Or.App. 757, 613 P.2d 88 (1980), *cert. denied sub nom. Mathews [sic] v. Oregon,* 450 U.S. 1040, 101 S.Ct. 1757, 68 L.Ed.2d 237 (1981); *In re Winstead,* 67 Ohio App.2d 111, 21 Ohio Ops.3d 422, 425 N.E.2d 943 (1980); *In re Ottolini,* 73 Ill.App.3d 971, 30 Ill.Dec. 81, 392 N.E.2d 736 (1979); *State ex rel. Kiritsis v. Marion Probate Court,* 269 Ind. 550, 381 N.E.2d 1245 (1978); *Cramer v. Tyars,* 23 Cal.3d 131, 151 Cal.Rptr. 653, 588 P.2d 793 (1979); *In re Beverly,* 342 So.2d 481 (Fla.1977); *State v. O'Neill,* 274 Or. 59, 545 P.2d 97 (1976); *Commonwealth ex rel. Finken v. Roop,* 234 Pa.Super. 155, 339 A.2d 764 (1975), *cert. denied,* 424 U.S. 960, 96 S.Ct. 1452, 47 L.Ed.2d 728 (1976).

The minority view was presented in *Denton v. Commonwealth,* 383 S.W.2d 681 (Ky.1964), where the rules governing civil commitments were held to be the same as those required in a criminal proceeding. The Kentucky Court of Appeals recognized the same basic rule that the United States Supreme Court declared three years later in the *Gault* decision and stated:

> Although lunacy inquests are not concerned with criminal intent or criminal acts they

may result in depriving the defendant of his liberty and his property. This deprival should be obtained only by the due processes of law under constitutional guarantees.

> We have therefore concluded that when a proceeding may lead to the loss of personal liberty, the defendant in that proceeding should be afforded the same constitutional protection as is given to the accused in a criminal prosecution. *Id.* at 682.

Presumably the 'constitutional guarantees' include the privilege against self-incrimination.

**6.** *Murel v. Baltimore City Criminal Court,* 407 U.S. 355, 92 S.Ct. 2091, 32 L.Ed.2d 791 (1972) (per curiam).

**7.** "... With respect to the possible duty of a trial court to explore alternatives to involuntary commitment in a civil proceeding, *cf. Lake v. Cameron,* 124 U.S.App.D.C. 264, 364 F.2d 657 (1966), which arose under statutes relating to treatment of the mentally ill." *In re Gault, supra,* 387 U.S. at 28 n. 41, 87 S.Ct. at 1444 n. 41.

relaxed procedural standards in several systems of purportedly 'civil' commitment—for juveniles, alcoholics, sexual deviates, narcotics addicts, and especially mental patients. In each of these situations, conduct disturbing to the community triggers an adjudicative proceeding whose sanction of ostensibly benign but nonetheless involuntary confinement is in reality prison-like, particularly when 'treatment' is either negligible or unwanted or both. When analysis thus focuses on the relation of sanctions to conduct, many of these systems resemble the arrangements in the juvenile process which the [*Gault*] Court refused to tolerate. The Court made casual reference to the juvenile-mental illness parallel [footnote 41], and its firm refusal to be bound by the civil-criminal dichotomy casts a long shadow over the conceptual device which has enabled many commitment systems to isolate themselves from procedural review.

*The Supreme Court, 1966 Term,* 81 Harv.L. Rev. 69, 174–175 (1967) (footnotes omitted).

Further support for Helvenston's position can be found in the concurring opinion of Justice Douglas in *McNeil v. Director, Patuxent Institution,* 407 U.S. 245, 92 S.Ct. 2083, 2091, 32 L.Ed.2d 719 (1972)[8]:

Whatever the Patuxent procedures may be called—whether civil or criminal—the result under the Self-Incrimination Clause of the Fifth Amendment is the same. As we said in *In re Gault,* 387 U.S. 1, 49–50, 87 S.Ct. 1428, 1455–1456, 18 L.Ed.2d 527, there is the threat of self-incrimination whenever there is 'a deprivation of liberty;' and there is such deprivation whatever the name of the institution, if a person is held against his will.

*Id.* at 257, 92 S.Ct. at 2091, 32 L.Ed.2d 719 (Douglas, J., concurring).

Of the three federal courts that have held the privilege applicable in civil commitment proceedings, two have expressly adopted or partially relied on Justice Douglas' position. In *Suzuki v. Quisenberry, supra* at 1131 n. 17, the court explicitly adopted Justice Douglas' position, while the concurring opinion of Justice Douglas in *McNeil* and the underlying majority decision in *Gault* were the bases for the court's holding that the Fifth Amendment privilege against self-incrimination applies in an involuntary civil commitment proceeding in *Lessard v. Schmidt, supra* at 1101. The *Lessard* court concluded that statements made to a psychiatrist by the subject of a commitment proceeding, unless voluntarily given after notice of the possible consequences, could not be the basis for an order of commitment. *Id.* at 1103.

In holding that the Fifth Amendment applies in civil commitment proceedings, the court in *Tyars v. Finner,* 518 F.Supp. 502, 508–509 (C.D.Cal.1981), approved the position taken by Chief Justice Bird of the California Supreme Court in a dissenting opinion[9] that the privilege automatically applied if deprivation of liberty might be the result of the proceeding.

In holding that the Fifth Amendment does not apply in civil commitment proceedings, the state courts have employed various techniques in arriving at this conclusion.

In *State ex rel. Kiritsis v. Marion Probate Court,* 269 Ind. 550, 381 N.E.2d 1245 (1978), the Supreme Court of Indiana found the subject of a civil commitment proceeding who had refused to permit a psychiatrist to conduct a mental examination to have been in contempt of court for such refusal. The involuntary civil commitment proceeding had followed a criminal defendant's acquittal by reason of insanity. In holding that the Fifth Amendment privilege against

---

**8.** Companion case to *Murel v. Baltimore City Criminal Court,* 407 U.S. 355, 92 S.Ct. 2091, 32 L.Ed.2d 791 (1972).

**9.** *Cramer v. Tyars,* 23 Cal.3d 131, 151 Cal.Rptr. 653, 660, 588 P.2d 793, 800 (1979) (Bird, C.J., dissenting). Tyars was a mentally retarded 20-year old who had been civilly committed because he was found to be a danger to himself and others. After his commitment was affirmed by the California Supreme Court, the United States District Court denied his habeas corpus petition because the state court's unconstitutional compulsion of his testimony was harmless error beyond a reasonable doubt.

self-incrimination is not automatically triggered by the possibility of the deprivation of liberty, the court said:

> [I]t is only where a proceeding seeks to impose a criminal or quasi-criminal sanction upon an individual for violation of its law that a proceeding can properly be labeled 'criminal.' 381 N.E.2d at 1247.

The court went on further to say that it must balance the individual's liberty against the state's interest in providing treatment for the mentally ill and protection of its citizens from such persons. 381 N.E.2d at 1248.

In *State v. O'Neill,* 274 Or. 59, 545 P.2d 97 (1976), the court held that *Miranda* warnings are not required before an individual is examined by a psychiatrist or others pursuant to an involuntary commitment proceeding.[10]

In *In re Matthews,* 46 Or.App. 757, 613 P.2d 88 (1980), the court had before it the question of due process and the Fifth Amendment privilege as it applied to the forced testimony of the subject of the civil commitment in the proceeding itself. The court, relying on *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), noted that to determine the specifics of due process in any given situation three factors must be considered: (1) the private interest that will be affected by the state action; (2) the state's interest, and; (3) the risk of erroneous decision if the procedure is not applied. 613 P.2d at 91. The court held that Oregon law provided significant procedural and substantive safeguards, and that therefore due process did not require that the subject of the proceeding be afforded the right to remain silent if his testimony might be used as a basis for his commitment.

In *Commonwealth ex rel. Finken v. Roop,* 234 Pa.Super. 155, 339 A.2d 764 (1975) *cert. denied,* 424 U.S. 960, 96 S.Ct. 1452, 47 L.Ed.2d 728 (1976), the court noted that not *all* due process requirements are automati-

cally applicable to proceedings that could result in confinement but that are not criminal prosecutions. The court held that an examining psychiatrist need not warn the subject of a civil commitment proceeding that he has a right to remain silent when the individual's interests have been sufficiently protected through other procedural safeguards. Such a warning was viewed as an undue interference with the diagnostic and treatment process. The court also raised the interesting and troubling question of whether a subject of the civil commitment proceeding has the capacity to knowingly waive his constitutional rights. 339 A.2d at 775 n. 14.

Other courts have held that the Fifth Amendment does not protect an individual in a civil commitment as long as the proceeding does not seek to elicit evidence which may result in any criminal prosecution. *In re Beverly,* 342 So.2d 481, 488–489 (Fla.1977); *In re Field,* 120 N.H. 206, 412 A.2d 1032, 1035 (1980).

With the foregoing in mind, we perceive the determinative issue in this case to be whether the proceedings under the judicial hospitalization statute, Tenn.Code Ann. § 33–604 (Cum.Supp.1982), are criminal or civil in substance. No one raises any question that Ms. Helvenston's statements in this proceeding could lead to criminal prosecution, where obviously the Fifth Amendment privilege could be invoked. *In re Beverly, supra; Murphy v. Waterfront Commission, supra.*

Whether the Fifth Amendment applies does not turn on what label is attached to the proceeding but rather on the purpose to be accomplished by that proceeding. The purpose of the judicial hospitalization statute is to provide medical treatment for the mentally ill, and, absent a showing to the contrary, we can only assume that the mental hospitals of this state are supplying the contemplated treatment and that the purpose and effect of judicial

**10.** In the case sub judice, the state's psychiatrist testified about previous examinations and treatment of Helvenston while she was a patient at the hospital, and the psychiatrist appar-

ently did not conduct nor testify about an examination made specially for the judicial hospitalization.

hospitalizations is not merely to isolate the mentally ill from society and detain them in what otherwise would amount to human warehouses. No evidence was presented and indeed no argument was even made that a gap exists between what the judicial hospitalization statute seeks to accomplish and what is actually being done. In a sense, a judicial hospitalization or involuntary commitment results in a deprivation of an individual's liberty. *See Humphrey v. Cady*, 405 U.S. 504, 510, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972). However, the deprivation of liberty in this instance is a part of the medical treatment deemed necessary for this type of illness.

Based upon the foregoing considerations, we are of the opinion that proceedings under the judicial hospitalization statute, Tenn.Code Ann. § 33–604 (Cum.Supp. 1982), are civil in nature and are not criminal for Fifth Amendment purposes. Therefore, we hold that the testimony of the examining and/or treating psychiatrist in a proceeding for involuntary hospitalization pursuant to Tenn.Code Ann. § 33–604 (Cum.Supp.1982), is not subject to objection on the ground that the person involved was not advised of her Fifth Amendment rights prior to the examination.

### HEARSAY

The psychiatrist was permitted to testify, over objection of Helvenston on the grounds of hearsay, as to information she obtained by reading papers in the medical records of Helvenston. The information obtained was a history of actions of Helvenston, some of which resulted in her immediate hospitalization.

Helvenston now contends that the admission of such testimony denied her the right to confront the witnesses (i.e., the persons who made the statements in the medical record from which the psychiatrist read) against her.

No attempt was made to procure the admission of the medical record under the Uniform Business Records as Evidence Act, Tenn.Code Ann. § 24–7–111 (1980). The evidence as presented was clearly hearsay, and since no attempt was made to bring it within the exception provided by the statute, it was error to admit it. However, it is the view of this court that the error did not affect the judgment or result in prejudice to the judicial process. T.R.A.P. 36(b)

For the reasons heretofore set out, we affirm the judgment of the court below and remand the case for any further proceedings necessary. The costs of the appeal are adjudged against the State.

NEARN, P.J. (W.S.), and HIGHERS, J., concur.