STATE, ex rel. Jerry McCORMICK, Sr., by his next friend, Nancy HIRST, on his own behalf and on behalf of all others similarly situated, Petitioner/Appellant,

v.

Charles BURSON, Attorney General and Reporter, State of Tennessee, Respondent/Appellee,

and

Wayne Hayes, Administrator, Metropolitan Bordeaux Hospital, Respondent.

Court of Appeals of Tennessee, Western Section.

Oct. 26, 1994.

Application for Permission to Appeal Denied by Supreme Court Feb. 21, 1995.

Linda L. Narrow, Gordon Bonnyman, Legal Services of Middle Tenn., Inc., Nashville, for petitioner/appellant.

Charles W. Burson, Atty. Gen. & Reporter, Dianne Stamey Dycus, Sr. Counsel, Nashville, for respondent/appellee.

HIGHERS, Judge.

This is an appeal from an Order of the Chancery Court for Davidson County upholding the constitutionality of T.C.A. §§ 34–11–101 et seq. and 34–13–101 et seq. (Supp.1992) of Tennessee's conservatorship statutes.[1]

---

**1.** This case was filed and disposed of entirely before the 1994 amendments became effective.

Petitioner, Jerry McCormick, Sr., suffered a serious head injury in August, 1991, which severely impaired his mental ability. He was admitted to Bordeaux Hospital in Nashville where he received nursing home care. On January 22, 1992, the Probate Court of Davidson County appointed petitioner's son, Jerry McCormick, Jr., as conservator on petitioner's behalf. After petitioner's condition improved, he remained involuntarily hospitalized at Bordeaux. He filed a petition for a writ of habeas corpus and for release from the hospital and the conservatorship, naming, in their official capacities, the State Attorney General, Charles Burson, and the hospital administrator, Wayne Hayes, as respondents. He also requested that the trial court certify his suit as a class action on behalf of all those who presently have a conservator appointed or who will later have one appointed. On behalf of the class and himself he asked the trial court to:

permanently enjoin enforcement of so much of the Tennessee conservatorship laws, and specifically the provisions codified at T.C.A. §§ 34–11–111(c)(2) and 34–13–108, as operate to permit the continuing deprivation of property and liberty interests of the petitioners, without any proof that the justification therefor continues to exist, and without an adequate opportunity for the petitioners to contest such continuing deprivation.

He claimed that the statutory provisions violated his due process and equal protection rights under both the United States and Tennessee Constitutions. In addition, he claimed that the provisions were invalid under the federal Supremacy Clause in that they violated both § 504 of the United States Rehabilitation Act of 1973, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq. (ADA).

On October 12, 1993, the Chancery Court ordered the conservatorship dissolved after finding that petitioner's condition had improved sufficiently that he could adequately care for himself and his property. The Chancellor reserved the remaining matters and dismissed the hospital's representative from the suit. On January 13, 1994, the trial court denied petitioner's motion for class certification, and, after finding that the other claims remained ripe, issued a Memorandum finding that neither Chapters 11 nor 13 of Title 34 were unconstitutional.

In his findings, the Chancellor recited the procedural rights provided by the code to petitioner. He noted the pre-appointment rights which T.C.A. § 34–13–106 provides a potential ward, including the right to: (1) a jury trial; (2) present evidence and cross-examine witnesses; (3) appeal; (4) attend all hearings; and (5) have an attorney appointed. Further, he recited the following provisions of T.C.A. § 34–13–108 pertinent to petitioner's claim:

(a) A conservator appointed under this chapter *may be discharged* or have its duties modified if the court determines that the [ward] is no longer a disabled person,.... *The disabled person* or *any interested person* on the disabled person's behalf may petition the court *at any time* for a termination or modification order under this section.

(b) A petition under subsection (a), if made by the disabled person, *may be communicated to the court* by *any* means including *oral communication* or *informal letter*.

(c) The court, upon receipt of the petition filed under this section, *shall conduct a hearing.* At the hearing, the disabled person has all of the *rights set out in [§] 34–13–106.*

(emphasis in the Memorandum).

The court stated that these provisions are intended for the ward's benefit and provide:

somewhat specific guidelines [for the court], in the creation and dissolution of a conservatorship.... It is unfortunate in this case that the petitioner's son, as conservator, or the hospital, or any of the physicians or medical providers, or any other interested person, or the petitioner, who was competent, did not take advan-

---

We note that, although those amendments substantially changed the statutory structure of conservatorships, they do not alter the issues pre-

sented by petitioner. *See* T.C.A. §§ 34–11–101 et seq. and 34–13–101 et seq. (Supp.1992 & 1994).

tage of the fairly simple procedure and extensive rights provided by T.C.A. § 34–13–108. However, this circumstance does not of itself render the challenged statutes unconstitutional.

The trial court adopted the Memorandum into its final order of February 16, 1994. Petitioner appealed, restating his arguments that the provisions are invalid under the various Constitutional provisions. The State, as appellee, claims that the case is moot and that the statutes are not unconstitutional.

## I.

■ The State contends that this case became moot when the trial court dissolved the conservatorship. Because no further relief was available to petitioner, the "case lost its character as a present, live controversy." It further alleges that the case was not within any recognized exception to the rule of mootness. Petitioner urges that this case is within the "capable of repetition yet evading review" category of the public interest exception to the mootness doctrine.

In *In re Helvenston,* 658 S.W.2d 99 (Tenn. App.1983), this Court discussed the public interest exception to the mootness doctrine. Quoting the opinion in *Dockery v. Dockery,* 559 S.W.2d 952, 955 (Tenn.App.1977), we stated:

> It is not easy to state any hard and fast rules by which questions which are of sufficient public interest to justify refusal to dismiss an appeal which has become moot. . . . However, the starting point is to determine the meaning of 'public interest.' Generally, public interest 'means something more than that the individual members of the public are interested in the decision of the appeal from motives of curiosity or because it may bear upon their individual rights or serve as a guide for their future conduct as individuals.' The types of issues the courts are likely to resolve despite their mootness are:
>
> *     *     *     *     *     *
>
> (7) questions which must necessarily become moot before the appeal can be heard.

*Helvenston,* 658 S.W.2d at 101 (citations omitted).

In *Dockery,* the court also listed as likely justiciable those cases with "questions involving the validity or construction of statutes." 559 S.W.2d at 955. We further note the Tennessee Supreme Court decision in *McCanless v. Klein,* 182 Tenn. 631, 188 S.W.2d 745 (1945), wherein the Supreme Court noted that while the doctrine of mootness should be applied as a general rule, an exception exists for cases "where the constitutionality of a statute was involved." *Id.* at 636, 188 S.W.2d at 747.

In *Helvenston,* we noted several similar cases where patients had been discharged before their appeals could be heard. 658 S.W.2d at 101, 102. *See Meisel v. Kremens,* 405 F.Supp. 1253 (E.D.Pa.1975); *Doe v. Madonna,* 295 N.W.2d 356 (Minn.1980); *Doe v. Colautti,* 592 F.2d 704 (3d Cir.1979) (appeal on constitutional grounds by discharged psychiatric patient with erratic hospitalization history not moot); *In re Ballay,* 482 F.2d 648 (D.C.Cir.1973) (inmate's appeal not moot despite discharge before appeal); and *Commonwealth ex rel. Bielat v. Bielat,* 257 Pa.Super. 446, 390 A.2d 1321 (1978) (appeal by person subject to involuntary commitment proceeding not moot despite discharge pending appeal).

In *Meisel,* an inmate lodged a constitutional challenge to a Pennsylvania statute pursuant to which he had been placed in a mental hospital. We noted the district court's holding that his release from the mental facility "did not render the action moot because he could at any time have been recommitted pursuant to the challenged statute." *Helvenston,* 658 S.W.2d at 102 (*citing Meisel,* 405 F.Supp. at 1254 n. 2).

In *Madonna,* several individuals were confined in a state mental institution before a hearing to determine their fitness was held. The court refused to grant class certification but found that their freedom had been denied by direct governmental action. Accordingly, their case was not moot because it was "capable of repetition, yet might evade review." *Madonna,* 295 N.W.2d at 361. The court further noted that this exception did

not require a possibility of repetition as to a particular plaintiff in order to apply. *Id.*

Besides involving the validity of the conservatorship statutes, we believe that this case is similar to *Helvenston* in that it "necessarily became moot" before the appeal could be heard. As in *Helvenston,* we find the reasoning in *Meisel* and *Madonna* persuasive. When petitioner was released from the power of his conservator, no "live controversy" remained. He could, however, be recommitted under the same statute and again released before an appeal could be taken. Although there is no proof that petitioner may suffer a relapse, we note that such is often the unfortunate case with these disabilities. *See Helvenston,* 658 S.W.2d at 101–02. Further, we do not find any strict requirement in Tennessee law that petitioner himself must show a probability of being recommitted. We also note that the confinement involved in petitioner's claim involves a significant loss of fundamental liberties. Considering all of these factors, petitioner's appeal has not been rendered moot by the dissolution of the conservatorship.

The State claims that this case is similar to *LaRouche v. Crowell,* 709 S.W.2d 585 (Tenn. App.1985), in which the petitioner claimed that his name was improperly excluded from the ballot. Since he had lost the election before the appeal was decided, the court held that the case was moot and did not fall within the public interest exception but primarily involved the petitioner's personal rights.

We believe that this case is distinguishable. *LaRouche* involved the right to be elected and the construction of a statute. The case at bar involves the right to freedom from confinement and other fundamental rights, including the right to vote and marry. The courts noted above have recognized the specific exception for the constitutionality of statutes in cases involving similar mental health confinements. The State's contention is denied.

## II.

Petitioner challenges the law on several constitutional grounds, but most of his arguments actually relate to procedural due process. Due process is a flexible concept and the procedural protections required vary according to the circumstances of the deprivation which occurs. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); *Williams v. Pittard,* 604 S.W.2d 845, 849 (Tenn.1980). The Tennessee Supreme Court has held that the Due Process Clause of the Fourteenth Amendment to the United States Constitution is synonymous with the "law of the land" provision of the Tennessee Constitution. *Newton v. Cox,* 878 S.W.2d 105, 110 (Tenn.1994).

The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides, in part, that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." *See Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Additionally, the Fourteenth Amendment to the U.S. Constitution provides, in part, that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law." The corresponding provision of the Tennessee Constitution provides "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land." Tenn. Const. art. I, Sec. 8. *Burford v. State,* 845 S.W.2d 204, 207 (Tenn.1992).

■ It is well recognized, and the State does not dispute, that the type of civil commitment to a hospital to which petitioner was subjected produces "a massive curtailment of liberty" and therefore requires due process protection. *Vitek v. Jones,* 445 U.S. 480, 491–92, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980) (*quoting Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972); and *citing Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979)). Further, as petitioner notes, even the criminally convicted retain certain fundamental rights in prison which the ward of a conservatorship relinquishes. *See Vitek,* 445 U.S. at 489–93, 100 S.Ct. at 1261–63.

However, "[t]he Due Process Clause simply does not mandate that all government

decisionmaking comply with standards that assure perfect, error-free determinations." *Mackey v. Montrym,* 443 U.S. 1, 13, 99 S.Ct. 2612, 2618, 61 L.Ed.2d 321 (1979). "It is also clear that a state may erect reasonable procedural requirements for triggering the right to an adjudication. . . ." *Burford,* 845 S.W.2d at 208. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (*quoting Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). In *Mathews,* 424 U.S. at 335, 96 S.Ct. at 903, the United States Supreme Court outlined the factors to consider when analyzing a case such as this.

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

(citations omitted)

■ The statutes at issue provide extensive procedural safeguards at the time of the conservator's appointment and petitioner does not challenge the initial appointment of his son as conservator. Petitioner's wife admitted that he was completely unable to care for himself at that time. He does, however, assert that the statutes provide an inadequate method for determining whether the ward remains incompetent after a conservator has been appointed. He claims that the State must somehow prove that a ward is, and will remain, incompetent at all times in the future. He contends that certain changes would improve the procedures available so that a ward would be less likely to remain in confinement after regaining competency and, therefore, that the statutes violate his procedural due process rights.

Petitioner first suggests requiring annual physician affidavits to be filed with the affidavit of the conservator. This would add an undue burden. Wards have an unlimited right to meaningful hearings under the procedure above. Petitioner has not shown any evidence to indicate what tangible benefits would result from such a requirement. There was, however, evidence of the large number of conservatorships in existence and their average length. Considering the availability of a review hearing, requiring these professional affidavits for every conservatorship appears to be an excessive burden to those who would incur the cost, whether the ward's estate or the State. We do not find that such a requirement would decrease the risk of an "erroneous deprivation" to a ward and if it would, we find that the risk would likely be outweighed by the excessive costs required.

Petitioner also asks that we require the State to provide notice to wards of their right to a hearing under § 34–13–108. Providing such notice in a meaningful fashion appears to be practically impossible. If given at the time of appointment, the ward will be incompetent. To require notice when competency is regained also appears useless because the court may simply call a hearing or dissolve the conservatorship at that time.

Petitioner also claims that a ward must have unlimited access to his medical records to satisfy procedural due process. He states, without citation, that the statutes allow a conservator to withhold these records and thus strip the value from petitioner's right to a hearing. We initially note that no section specifically excludes the ward from access to medical records. However, if the conservator has denied reasonable access to a ward who has petitioned for a dissolution of the conservatorship, the trial court has the discretion to discharge the conservator or release the records, depending on the best interests of the ward. T.C.A. § 34–13–108(a), (d)(5). Thus a petitioner will not be denied a meaningful hearing.

Petitioner claims that we should shift the burden of proof to show competency from the ward to the conservator. We note initially that the statute vests the trial court with wide discretion here and no clear standard of proof is espoused in the law. *See Tate v. Ault,* 771 S.W.2d 416, 419 (Tenn.App.1988).

The applicable standard appears to be whether the trial court finds that the ward is "capable of managing his own affairs and estate." *See id.* The court must do whatever is in the ward's best interest. The State's interest in requiring the "clear and convincing" burden exclusively in the initial adjudication is compelling. Such a repeated burden would entail significant expense and create risks that wards, who have already been proven incompetent, would not be cared for. This is further possible since anyone may request an unlimited number of hearings. To leave that procedure open, the trial court must have the broad discretion that it does to ensure that incompetents remain properly cared for.

"At some point, the benefit of an additional safeguard to the individual ... and to society ... may be outweighed by the cost." *Mathews,* 424 U.S. at 348, 96 S.Ct. at 909. What petitioner asks for here would require the conservator to conduct new medical examinations at each hearing, regardless of what proof, if any, the ward presented of his recovery. Switching the burden of proof from the time of the initial appointment is justified by the logic that after one adjudication of incompetency, the State's interest in protecting the ward is necessarily heightened in that the ward's incompetence creates a need for care and control. The statutes provide a "reasonable" procedure for triggering a hearing within *Burford.* They allow the ward to call a "meaningful hearing," at any time, at which he may prove regained capability. They also allow the conservator to continue to provide vital care for the ward without expensive and unnecessary procedural burdens. It appears narrowly tailored to the State's interests. We find that the State's very simple procedure for contesting incompetency, especially in light of the interest in containing costs to the estate of wards and itself, affords adequate due process.

### III.

■ The petitioner also argues that the statutes violate his substantive due process rights. In determining whether a substantive due process right has been violated, we must balance the "liberty of the individual" and "the demands of organized society." *Youngberg v. Romeo,* 457 U.S. 307, 320, 102 S.Ct. 2452, 2460, 73 L.Ed.2d 28 (1982) (*quoting Poe v. Ullman,* 367 U.S. 497, 542, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961)). Where a fundamental right is involved, due process requires that the State's interest be compelling. *Garner v. Memphis Police Dept.,* 710 F.2d 240, 247 (6th Cir.1983), *aff'd* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

As noted above the ward's interest is quite strong. The State's interest in creating and maintaining conservatorships for incompetents is equally strong and petitioner does not take issue with it in general. The statutes provide an essential mechanism for the survival of otherwise incompetent persons and the State's interest in aiding them cannot be understated. *See State Department of Human Services v. Northern,* 563 S.W.2d 197, 213 (Tenn.App.1978) (Drowota, J., concurring); *O'Connor v. Donaldson,* 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975). However, petitioner challenges the ongoing nature of the conservatorship and contends that there are insufficient safeguards to ensure that a ward is still incompetent and thus in need of the State's protection. For his substantive claim, he relies on federal cases holding that a person who regains his sanity or is no longer a danger to himself or others must be released from confinement. *Foucha v. Louisiana,* 504 U.S. 71, 77–83, 112 S.Ct. 1780, 1784–1787, 118 L.Ed.2d 437 (1992); *O'Connor,* 422 U.S. at 575, 95 S.Ct. at 2493–94; *Vitek, supra.* His reliance is misplaced.

In *Foucha,* the United States Supreme Court struck down on due process grounds a Louisiana statute which allowed the state to keep a defendant found not guilty by reason of insanity in confinement regardless of whether he remained insane. *Foucha,* 504 U.S. at 83, 112 S.Ct. at 1787. The Court held that it was impermissible to do so when the ward was no longer mentally ill and had never been found guilty of a crime. *Id.* The ward in that case had petitioned for release and, despite the fact that physicians found that no mental illness remained, the trial court denied his request. *Id.* at 73–75, 112

S.Ct. at 1782–83. The situation here differs in that petitioner was released upon his request. The State did not deprive him of liberty without justification. The statutes only allow control by a conservator when the ward is incapable of caring for himself or his property. If there is any question whether the disability has ended, the trial court "shall conduct a hearing" to determine whether the ward has regained minimal capacity. T.C.A. § 34–13–108(c). The statute also provides an easy method to request such a determination; the ward can simply call or write the court or anyone else may file a petition. We do not find that the statutes involved unjustifiably restrict a ward's liberty on the grounds of substantive due process.

## IV.

■ We next examine petitioner's claim that the conservatorship scheme deprived him of his right to equal protection by treating him, and others for whom a conservator has been appointed, differently than those who have been civilly committed. He also claims that he was treated differently than those who have conservatorship proceedings pending in that the latter group enjoys extensive rights to challenge an appointment. "While recognizing that '[t]he equal protection provisions of the Tennessee Constitution and the Fourteenth Amendment are historically and linguistically distinct,' [the Tennessee Supreme] Court has followed the framework developed by the United States Supreme Court for analyzing equal protection claims." *Newton v. Cox, supra,* 878 S.W.2d at 109 (first alteration in original) (*quoting Tennessee Small School Systems v. McWherter,* 851 S.W.2d 139, 152 (Tenn. 1993)). Depending upon the rights asserted, the courts will utilize one of three standards of scrutiny: reduced scrutiny, heightened scrutiny, and strict scrutiny. *Newton,* 878 S.W.2d at 109. Under the concept of equal protection espoused by both constitutions:

all persons similarly circumstanced shall be treated alike. Conversely, things which are ·different in fact or opinion are not required by either constitution to be treated the same. The initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the

States, and legislatures are given considerable latitude in determining what groups are different and what groups are the same.

*Tennessee Small School Systems,* 851 S.W.2d at 153 (citations omitted).

Equal protection requires strict scrutiny only when the classification at issue interferes with the exercise of a "fundamental right" or disadvantages a "suspect class." *Newton,* 878 S.W.2d at 109. As noted above, petitioner claims that the State's classification deprives him of several "fundamental rights" including the rights to vote. Besides the fundamental nature of those rights, *see Doe v. Norris,* 751 S.W.2d 834, 841 (Tenn. 1988), the Tennessee Supreme Court has stated that it could not "conceive of any right more fundamental ... than the right to personal liberty." *Id.* We agree that strict scrutiny is appropriate.

■ Because the confinement of petitioner impinged on his fundamental rights, "we must examine that classification and determine if the State has demonstrated that 'its classification has been precisely tailored to serve a compelling state interest.'" *Id.* at 842 (*quoting Plyler v. Doe,* 457 U.S. 202, 217, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982)). The petitioner does not quarrel that there is a compelling state interest in protecting wards who are incompetent to care for themselves. He contends, however, that he and others like him no longer need the aid of a conservator when they regain their capacity. He argues that no compelling interest exists to confine them when they have returned to health.

Petitioner's novel argument is again misplaced. The interest of the State and society is definite and compelling in allowing a conservator legal control over a person adjudicated incapable of minimal self-care. *See Northern, supra,* 563 S.W.2d at 206, 211; *Vitek, supra,* 445 U.S. at 491–92, 100 S.Ct. at 1262–63. What petitioner is actually claiming again is that the procedure for dissolving a conservatorship is defective. As we noted in our due process analysis, the statutes provide an ample opportunity for petitioner or others to request a hearing, with considera-

ble procedural rights including a jury trial, to determine whether he has become capable of caring for himself. The right to counsel granted by § 34–13–108 exceeds the rights guaranteed by the Sixth Amendment and should further the fairness of these proceedings. *See In re Rockwell,* 673 S.W.2d 512, 515 (Tenn.App.1983). These safeguards ensure that no ward will "suffer a continued deprivation of rights" as petitioner claims.

Petitioner has not challenged the necessity of the statutes at issue. He only claims that they should not have affected him once he was healed. We agree, but in light of our holding on their procedural adequacy, we find that they are tailored to apply only to actual incompetents. The State's interest in protecting those adjudicated incompetent survives strict scrutiny review and the statutes do not violate the equal protection.

## V.

Petitioner's final argument is that the statutory scheme discriminates against those for whom a conservator has been appointed in violation of the Rehabilitation Act and the ADA. Because the Rehabilitation Act only applies to federally funded programs, *see* 45A AmJur2d § 30, we dispense with it and analyze only the ADA claim, which does apply to state governments.

 The ADA prohibits a public entity from discriminating against a qualified individual with a disability, or excluding him "from participation in or ... the benefits of the services, programs, or activities" of the entity. 42 U.S.C. § 12132. A qualified individual with a disability is one who "with or without reasonable modification to rules, policies, or practices, ... meets the essential requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131. The State's action here does not discriminate against wards within this context. The statutes do not deny the ward any benefits or programs but transfer control of the ward and his property to a person who can protect the ward when the ward cannot. The wards we are contemplating here do not meet the "essential requirements" test. When the ward is sick, he is not qualified to maintain himself. If and when a ward does regain capacity, he does not receive dissimilar treatment by the State because his conservator is discharged. The fact that petitioner or anyone else failed to contact the court to request his release does not entitle him to an ADA claim for the time he remained at Bordeaux after regaining competency. Thus the statutes do not run afoul of the federal statutes or the Supremacy Clause.

The judgment of the trial court is affirmed. Costs are adjudged against appellant McCormick.

CRAWFORD and FARMER, JJ., concur.