IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 1, 2003

## IN RE: MARTHA BLANKS MAXWELL, CONSERVATORSHIP

**Appeal from the Chancery Court for Warren County**
**No. 8070     Charles D. Haston, Sr., Chancellor**

---

**No. M2002-01654-COA-R3-CV - Filed September 25, 2003**

---

The niece of an elderly woman who suffered a stroke, followed by memory loss and confusion, petitioned the court to be appointed as her aunt's conservator.  The trial court granted the petition as well as the conservator's plan to have her aunt moved to an assisted living environment. There, the woman's condition improved, and the guardian ad litem moved the court to consider whether it was advisable to revoke the conservatorship and allow her to return to her own home. After a hearing, the court terminated the conservatorship.  The former conservator appeals, and we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., and WILLIAM B. CAIN, JJ., joined.

Thomas O. Bratcher, McMinnville, Tennessee, for the appellant, Daisy Maxwell.

Mary M. Little, McMinnville, Tennessee, for the appellee, Martha Blanks Maxwell.

**OPINION**

**I.  The Facts**

Eighty-six year old Martha Blanks Maxwell suffered a stroke in December of 2001.  After medical treatment, she continued to suffer from physical weakness, dizziness and memory loss.  Her niece, Daisy Maxwell, assisted her during this difficult period, but became convinced that her aunt could no longer safely manage her own affairs, or continue to live by herself in her McMinnville home.

Although Daisy Maxwell is Martha Maxwell's niece, she was raised by Martha Maxwell and her late husband beginning when she was ten days old, and the relationship of the parties was like

mother and daughter. On December 18, 2001, Daisy Maxwell filed a Petition in the Warren County Chancery Court to be appointed as her aunt's conservator. The Petition was accompanied by the affidavit of Dr. Timothy Fisher, who was familiar with Martha Maxwell's medical history and condition, and declared that it was his opinion that she was a disabled person and unable to manage her financial affairs.

Martha Maxwell was served with the Petition, and the court appointed a Guardian ad Litem to protect her interests. *See* Tenn. Code Ann. § 34-1-107. A hearing on the proposed conservatorship was conducted by the Clerk and Master of the Warren County Court on December 21, 2001. He granted the Petition, and issued Letters of Conservatorship to Daisy Maxwell. No one, including Martha Maxwell, questions the need for the conservatorship at that time. The conservator subsequently prepared an inventory of her ward's estate, which showed that she had extensive assets, including her home, numerous bank accounts and a large life insurance policy.

Upon a further hearing, the trial court ordered that Daisy Maxwell secure and file a corporate surety bond in the amount of $400,000 to secure the performance of her duties as conservator. *See* Tenn. Code Ann. § 34-1-105(a). The court also approved the conservator's plan to place her aunt in an assisted living facility. Martha Maxwell subsequently began living at the McMinnville Residential Center. She participated in and enjoyed many of the activities at the Center, and experienced a significant improvement in her condition. All the witnesses agreed Martha Maxwell had improved.

As her condition improved, however, Martha Maxwell began to express a desire to return to her own home. She told the Guardian ad Litem that she did not know whether or not she needed a conservator, but that she knew she wanted to go home. On May 23, 2002, the Guardian ad Litem filed a Motion on her behalf, asking the court to consider the question of her continuing need for a conservator, and whether it would be in her best interest to reside at the McMinnville Residential Center or to move back into her home place.

The court conducted a hearing on June 18, 2002. Because of some confusion about scheduling, additional testimony had to be heard on July 2. Martha Maxwell testified on both dates. Other witnesses were Daisy Maxwell, her forty-seven year old son, and the Director of Nursing at the McMinnville Residential Care Center. At the conclusion of the proof, the trial court ruled from the bench that the conservatorship should be terminated immediately, with all assets under the conservator's control to be immediately returned.

Martha Maxwell's attorney prepared an Order reflecting the trial court's ruling, including the immediate return to Martha Maxwell of "[a]ll books, personal papers and effects, personalty and other property." The order also stated, "[t]he conservator shall file her report in accordance with statute and on approval shall be discharged from her bond." Daisy Maxwell's attorney refused to sign the order because he believed that it did not adequately protect her interests.

On July 5, 2002, Daisy Maxwell's attorney filed a Notice of Appeal, a Motion to Stay the court's Order pending the result of the appeal, and a Motion to Alter or Amend the Judgment. The Motion to Alter or Amend asked the court to restore any funds withdrawn from the conservatorship accounts to the conservator's control. On the same day, Martha Maxwell's attorney filed a Motion for Contempt, alleging that the conservator had refused to comply with the orders of the court regarding the return of all of the ward's assets.

On July 12, the court held the final hearing in this matter, during which all pending motions were considered. The court denied the request for a stay, as well as the motion to alter or amend the judgment. It did however, order that $10,000 be deposited with the Clerk and Master, for him to hold pending the final accounting, and to use for settlement of any claims arising against the Conservatorship. In light of the court's action, the ward's attorney voluntarily non-suited his motion for contempt.

## II. A Question of Capacity

The former conservator argues that the trial court erred in finding that Ms. Martha no longer needed a conservator and that she was competent to manage her own affairs and live in her own home. She also contends that the trial court violated the conservatorship statutes by ordering the immediate release of the ward's assets before an accounting could be made. We will deal with the question of capacity first.

By statute, a conservator may be discharged and the conservatorship terminated if the court determines the ward is no longer a disabled person or that it is in the best interests of the disabled person that the conservatorship be terminated. Tenn. Code Ann. § 43-3-108(a). A disabled person is defined as any adult "determined by the court to be in need of partial or full supervision, protection and assistance by reason of mental illness, physical illness or injury, developmental disability or other mental or physical incapacity." Tenn. Code Ann. § 34-1-101(7). Stated otherwise, to terminate a conservatorship, the trial court must find that "the ward is capable of managing his own affairs and estate." *State ex rel McCormick v. Burson,* 894 S.W.2d 739, 745. (Tenn. Ct. App. 1994). Review of this finding of fact is governed by Rule 13(d) Tenn. R. App. P. *See Tate v. Ault,* 771 S.W.2d 416, 419 (Tenn. Ct. App. 1989). Under Rule 13(d), a presumption of correctness accompanies the trial court's findings of fact, which will not be reversed on appeal unless the evidence preponderates otherwise.[1]

---

[1] We note that Tenn. Code Ann. § 34-1-126 states that "[t]he court must find by clear and convincing evidence that the respondent is fully or partially disabled and in need of assistance from the court before a fiduciary can be appointed." In contrast, Tenn. Code Ann. § 34-3-108(a), which deals with the discharge of a conservator, is silent as to the standard of proof required for such proceedings. We must presume this silence is purposeful and, consequently, the preponderance of the evidence standard generally applicable to civil cases also applies to termination of conservatorship proceedings. The difference in the applicable burdens can be explained by the nature of a conservatorship. A heightened standard is appropriate for the creation of a conservatorship because such a decision necessarily means a limitation on the ward's freedom of choice and a retraction of some basic rights from the ward. Such

(continued...)

The conservator argues that both the medical proof and Martha Maxwell's own testimony show that she is incapable of handling her own affairs or living on her own. But it appears to us that the medical proof has not been sufficiently developed to permit a conclusive finding as to capacity. The proof includes the May 29, 2002 signed affidavit of Dr. Timothy Fisher, which contains no new information. The affidavit is identical in language to the affidavit of December 18, 2001 that was used to support the initial petition for conservatorship, including his statement that "I recommend that a Conservator be appointed."

The affidavit is accompanied by numerous pages of medical records from the periods both before and after the creation of the conservatorship. Since the ward does not dispute that she needed a conservator in December of 2001, the pre-conservatorship records are not probative of her current condition, but they do create a context for the more recent records.

These reveal a urinary infection in February of 2002, which testimony established can cause confusion, dizziness and a fall on March 4, numerous lab tests, and an MRI of the brain. The conservator lists the MRI findings in her brief: moderate supratentorial atrophy, mild cerebral atrophy, basal ganglia hemorrhage of left basal ganglia and meningioma in right frontal region. Obviously, without further explanation or interpretation by an expert witness, such findings are of very little help to the court in determining Martha Maxwell's ability to function. More relevant are the doctor's findings of "probable Alzheimer's dementia" and memory loss. But the most useful evidence as to the severity of these conditions comes from the testimony of Martha Maxwell herself, and of Kay Grider, Director of Nursing at the McMinnville Residential Care Center.

As we indicated above, the trial court heard the testimony of Martha Maxwell on two occasions fourteen days apart. On both occasions, she was oriented to time and place, knew the purpose of the hearings, and was consistent in expressing her desire to live in her own home. She also showed some lapses of memory, every one of which is listed in the conservator's brief. These included giving the wrong name for the residential center in which she lived during her first appearance (although she corrected the error in her second appearance), forgetting the number (but not the street name) of her home address, naming Daisy Maxwell as her next of kin instead of her sister, and forgetting the names of doctors who had examined her, people in the nursing home, and long-time neighbors. She herself admitted she has problems remembering names.

[1](...continued)
is not the case when the question under review is the termination of the conservatorship. The Legislature declined to declare the clear and convincing standard applicable to proceedings for the discharge of a conservator, and we also decline to do so. We note that a number of states employ different standards for creating and terminating a conservatorship and that the preponderance of the evidence standard is commonly used to decide whether a conservatorship should be terminated. Additionally, the Uniform Guardianship and Protective Proceedings Act (1997) § 318 cmt., 8A U.L.A. 174 (Supp. 2003) states:

> Although clear and convincing evidence is required to establish a guardianship, the petitioner need only present a prima facie case for termination [of the guardianship]. Once the petitioner has made out a prima facie case, the burden then shifts to the party opposing the petition to establish by clear and convincing evidence that continuation of the guardianship is in the best interest of the ward.

Her memory problems will undoubtedly make it more difficult for Martha Maxwell to function effectively. But her testimony demonstrated a realistic understanding of her own limitations. She knew she would be needing some help, and she was aware of the resources that were available to her. She testified that her financial assets were sufficient to enable her to hire sitters to stay with her around the clock. She also knew that her nieces and nephews were willing to keep tabs on her, and would fill in if her sitters didn't come.

At the hearing of July 2, she voluntarily surrendered her driver's license to the court, declared that she would no longer drive her car, and revealed that since the earlier hearing she had spoken to four potential sitters and discussed payment terms with them. She testified that she would rely on her long-standing relationship with First National Bank if she needed assistance with her money. She also declared her willingness to get a monitoring device to wear around her neck to enable her to call for help if she got into trouble, and to enroll in the Sheriff's check-in system where she would receive a daily phone call to check on her status.

During the same hearing, Kay Grider testified as to some problems Martha Maxwell was vulnerable to outside the confines of her facility, including the possible unreliability of sitters and the tendency of some dementia sufferers to forget to eat. But she also testified that Ms. Martha was an independent, strong-willed person, and she affirmed her monthly assessment, prepared on May 30, 2002, that indicated that Ms. Martha was consistently well-groomed, that she participated in Bingo and other group activities, always volunteered to help others, was outgoing and had good body strength for her age.

After hearing all the evidence, the trial court concluded that Martha Maxwell was mentally and physically capable of managing her own affairs and living in her own home. We do not believe the evidence preponderates against the trial court's finding.

We note, however, that under Tenn. Code Ann. § 34-3-108(d) the trial court's discretion is not necessarily limited to a choice between continuing the conservatorship and terminating it. That statute gives the court the additional option of modifying its original order to meet the altered situation of the ward. Tennessee Code Annotated § 34-3-107 sets out the range of the court's authority to specify or limit the powers the conservator may exercise over the property of the ward. Additionally, Tennessee Code Annotated § 34-1-127 directs the court "to ascertain and impose the least restrictive alternatives upon the disabled person which are consistent with adequate protection of the disabled person and disabled person's property." These statutes could perhaps have been used to shape the results of the proceeding in this case, with the trial court fashioning a plan to enable Martha Maxwell to live in her own home and manage some of her own affairs, while still receiving some of the protections afforded by a conservatorship. However, the trial judge chose to terminate the conservatorship. We view the statutes as giving the trial court broad discretion in fashioning the most appropriate remedy. In light of the facts of this case, we cannot say that the trial court abused its discretion.

### III. The Return of the Assets

Tenn. Code Ann. § 34-3-108(e) sets out the procedure for dealing with the property of the ward after the termination of a conservatorship:

> (e) When the disabled person dies or the court earlier determines a conservator is no longer needed and issues an order terminating the conservatorship, the conservatorship shall terminate. Within one hundred twenty (120) days after the date the conservatorship terminates, the conservator shall file a preliminary final accounting with the court, which shall account for all assets, receipts and disbursements from the date of the last accounting until the date the conservatorship terminates, and shall detail the amount of the final distribution to close the conservatorship. If no objections have been filed to the clerk's report on the preliminary final accounting within thirty (30) days from the date the clerk's report is filed, the conservator shall distribute the remaining assets...

As we noted above, the trial court's order terminating the conservatorship also directed the conservator to file her report in accordance with the above statute. The conservator argues, however, that the judge was in violation of state law, because he ordered the immediate return to Ms. Maxwell of all funds in the hands of the conservator, and that Tenn. Code Ann. § 34-3-108(e) requires that the conservator retain all funds until the final accounting is completed and approved. It appears to us, however, that a fair reading of the above statute does not support the conservator's argument that the conservator was entitled to retain all of the ward's assets for an additional 120 days. The statute clearly says the conservatorship shall terminate upon the court's order.

The trial judge found that Martha Maxwell would need access to her money in order to meet the obligations that accompanied the termination of her conservatorship and her return home. The judge concluded that it was unreasonable to make an 86 year old woman wait 120 days before she could reclaim what was rightfully hers, and ordered the immediate return of all her assets.

We note that during the hearing of July 12, 2002, the trial court heard a report as to the progress Martha Maxwell had made after her adjustment to the move home and the debts the conservator might still be legally responsible for. The conservator's attorney was reluctant to give an estimate of the amount outstanding, but he conceded that a sum less than $100,000 would probably be sufficient to cover all obligations.

The ward's attorney stated that the assisted living center had been paid every month, and that only five days' worth (at $77 a day) remained unpaid. Martha Maxwell was seen by several doctors during the conservatorship, but there is no evidence in the record of any major medical procedures she underwent during that time, other than an MRI of the head. It is unclear whether any payment has been made for medical expenses.

The trial judge ordered Ms. Martha's attorney to deposit $10,000 with the court to cover any remaining obligations of the conservator. Tenn. Code Ann. § 34-1-104(c) authorizes such a procedure for dealing with conservatorship assets under circumstances similar to those present here. Tenn. Code Ann. § 34-1-121(a) gives the court discretion to waive any requirements set out in chapters 2 and 3 of Title 34, clearly including Tenn. Code Ann. § 34-3-108, if such waiver is in the best interest of the ward. To the extent Tenn. Code Ann. § 34-3-108(e) can be read to place a limitation on the return of a ward's assets upon termination of a conservatorship, which we do not think it does, the trial court had discretion to order the immediate return. We find no abuse of that discretion. It appears to us that the judge was attempting to balance the rights of the former ward with the conservator's possible need to be protected from creditors of the conservatorship estate.

We note that the ward's attorney stated that Martha Maxwell "has never welched on a debt," and that "[s]he'll pay the bills if they give her the bills." If a question arises as to attorney fees or court costs, these have to be approved by the trial court in any case. *See* Tenn. Code Ann. § 34-4-114. Finally, if the amount deposited is insufficient to satisfy obligations legitimately incurred for the benefit of the ward, the conservator would be entitled to indemnification from her former ward. In sum, it appears to us that the trial court's distribution of the assets was not in violation of state law, and was eminently reasonable.

## IV. Conclusion

The order of the trial court is affirmed. Remand this cause to the Chancery Court of Warren County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellant.

_____
PATRICIA J. COTTRELL, JUDGE