[Cite as *Frash v. Ohio Dept. of Rehab. & Corr.*, 2016-Ohio-360.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Mark J. Frash, Administrator of the Estate of Mark Wayne Frash, Deceased, | : | |
| | : | |
| Plaintiff-Appellant, | : | No. 14AP-932 (Ct. of Cl. No. 2011-04941) |
| v. | : | |
| | : | (REGULAR CALENDAR) |
| Ohio Department of Rehabilitation and Correction, | : | |
| | : | |
| Defendant-Appellee. | : | |
| | : | |

## D E C I S I O N

### Rendered on February 2, 2016

*Swope and Swope, Attorneys at Law*, and *Richard F. Swope*, for appellant.

*Michael DeWine*, Attorney General, and *Eric A. Walker*, for appellee.

### APPEAL from the Court of Claims of Ohio

BRUNNER, J.

{¶ 1} Plaintiff-appellant, Mark J. Frash, as administrator for the estate ("Estate") of the late Mark Wayne Frash ("M.W. Frash"), appeals a judgment of the Court of Claims of Ohio in favor of defendant-appellee, Ohio Department of Rehabilitation and Correction ("ODRC"), on a claim arising from the death of M.W. Frash at the hands of a fellow inmate, Eugene Groves. Specifically, the Estate argues that the Court of Claims improperly denied requests to obtain and use at trial Groves' psychiatric records and erred in finding against the Estate on the merits of its claim. We find that the Court of Claims committed errors in applying discretionary immunity, in allocating the burden to establish privilege and the relevance of medical and psychiatric records sought in

discovery, and improperly concluding that ODRC was without constructive notice of an impending attack by Groves. We reverse the decision of the Court of Claims and remand for a new trial.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Rather than obtain a transcript, the Estate accepts the factual determinations of the Court of Claims as true for the purposes of this appeal and proposes only to argue legal issues. *See, e.g.*, *Corbin v. Dailey*, 10th Dist. No. 08AP-802, 2009-Ohio-881, ¶ 5-6. Thus, in reviewing the Court of Claims' decision, we adopt and accept its factual findings.

> At all relevant times, Frash was an inmate in the custody and control of [ODRC] at [Ross Correctional Institution (RCI)], housed in unit 8B. RCI houses both level 2 and level 3 inmates. Frash worked as a dog handler at RCI and on September 12, 2010, he was walking a dog out in the recreation yard when he was approached by a fellow inmate, Eugene Groves (Groves). According to inmate Jeremy Maxwell's (Maxwell) testimony, Groves said to Frash, "Get your dog away from me or if not, I'll kill it." In response Frash said, "You ain't going to kill my dog, you f'ing N word. You kill my dog, and I will kill you." (Plaintiff's Exhibit 16, Page 28, Lines 4-14.) Maxwell further testified that Frash later went into the prison to apologize to Groves and that Groves walked away and to his cell. Groves then returned to the day room and began his attack on Frash.

> At the time of the incident, the corrections officer (CO) in unit 8B was Christopher Hawk (Hawk), a relief officer who had started working at RCI two weeks prior. Hawk opened the door to let Frash in and while walking back to his desk, was bumped in the back. Hawk turned to observe what appeared to be a fight between Frash and Groves. Hawk gave orders to stop fighting, and upon hearing another inmate make reference to Groves "sticking" Frash, noticed that Groves had a shank in his hand. The shank was fashioned out of a bolt or screw and was approximately seven inches long. (Plaintiff's Exhibit 4.) During the entire time of the incident, Hawk was within ten to fifteen feet away. After noticing the weapon, Hawk gave another order for Groves to drop his weapon, but the fight continued. Hawk then attempted to call someone for help, but could not call anyone due to his unfamiliarity with the institution and the proper numbers to call, so he pulled his man down alarm and waited for assistance.

There were approximately 20-30 inmates in the vicinity when the fight began. Inmate Christopher Griffis (Griffis) testified that as soon as Groves came up behind Frash, he began hitting him in the back of the head. Groves put Frash in a headlock and continued to hit and stab him repeatedly, which resulted in nine penetrating wounds according to the coroner's report. Groves then disengaged himself and walked outside. At that point, another inmate attempted to pick up a chair to hit Groves, but Hawk ordered him to put the chair down and step away. Shortly thereafter, Nathaniel Charlton (Charlton), the yard CO, arrived in response to Hawk's man down alarm. Charlton testified that he responded to the scene within ten seconds of the alarm being pulled, and at the time he arrived, the fight was already over. Hawk informed him that Groves had walked outside and Charlton went outside to restrain him. Frash later died from a traumatic brain injury as a consequence of blunt force trauma to the head. The autopsy noted galeal, subgaleal, and subdural hematomas as well as cerebral edema with cerebellar tonsillar herniation. (Plaintiff's Exhibit 5.) Other than the autopsy report, no other medical evidence was presented as to Frash's cause of death.

Groves had a long history of violence and psychological issues. In 1976, Groves was incarcerated for felony assault, kidnapping, attempted murder, and murder. As part of his intake screening evaluation, it was concluded that Groves could be unstable and had a severe paranoid personality. From 1984 to 1999, Groves had five instances of assault while in prison. In 1984, Groves stabbed an inmate in the chest with a pair of upholstery shears and was found not guilty by reason of insanity. The same year, a psychologist suggested that he be very closely observed because he could possibly be paranoid schizophrenic. In 1988, Groves stabbed his cellmate which resulted in an attempted murder conviction. In 1994, Groves stabbed an inmate in the neck, and in 1996, Groves assaulted another inmate using a can lid to cut his face. Lastly, in 1999, Groves used a shank to stab a fellow inmate. Throughout his incarceration Groves had many evaluations of his security classification as well as psychological evaluations. After several reevaluations, [ODRC] eventually determined that Groves' security classification could be reduced. In 2003, Groves' security classification was reduced from a level 5 to a level 4, and by March 2006, his security level was lowered to level 3 with a permanent single cell assignment. In 2007, Groves was assigned to RCI, and during his time at RCI, Groves was not involved in any attacks or fights. Until the

incident with Frash, Groves had not been involved in any attack or fight for more than ten years.

* * *

The evidence demonstrates that the attack occurred because of and shortly after an interaction between Groves and Frash in the yard. There was no testimony presented that a CO was a witness to that interaction, and there was no prior threat by Groves to Frash directly, only a threat to the dog that Frash was walking. Deputy Warden Jeffrey Lisath (Lisath) also testified that there was no previous notice of altercations or disputes between Groves and Frash.

[A]lthough Groves had previously attacked fellow inmates prior to being transferred to RCI, Lisath and inmate Griffis testified that Groves was not involved in any prior attacks or fights during his entire time at RCI. Further, records indicate that his last assault while in prison was in 1999, more than ten years before his attack on Frash. Although inmate Maxwell testified that Groves had a reputation in the prison for being a "crazy man" * * *.

* * *

Inmate Maxwell testified that his side of the block was for level 2 inmates and that the other side was for level 3 inmates. Hawk testified that the block was medium security which he thought was level 2. However, Lieutenant Patrick Numberger testified that 8B was closed security which constituted level 3 security. The court finds that Numberger's testimony, based on his 21 years as a CO at RCI, is more reliable than Maxwell's and Hawk's testimony with regard to security classifications.

Hawk and Lisath testified that COs are instructed to wait for help before intervening in a fight for safety reasons. Numberger also testified that COs are not required to intervene. [ODRC]'s rules and procedures regarding use of force state that "[a]s employees of the Department, we have a duty to protect inmates, staff and third persons, but there is no requirement to needlessly sacrifice one's own personal safety in doing so. * * * An employee must balance his or her ability to be effective against the risk to personal safety. * * * Whenever possible, an employee shall summon assistance before becoming involved in a use of force. If an employee cannot effectively intervene in a situation, the employee is expected to continue to be observant of as many

circumstances of the situation as possible to be reported later." (Plaintiff's Exhibit 11, page 3.) Hawk testified that he gave verbal commands to stop and that he determined that intervention would have been ineffective and could have possibly escalated the situation, leading to an assault on officers or prisoners gaining control of the area. * * * Moreover, Hawk testified that the whole situation surrounding the fight only lasted around 30 seconds. Although inmate Maxwell guessed that the fight lasted five to ten minutes, the way he described the events supports a much shorter time frame. Inmate Maxwell testified that the stabbing was in rapid succession and occurred very quickly. He further testified that Frash went limp after the third or fourth stab, which occurred within a "matter of seconds" after the fight first began. Another inmate, Robert Lovely (Lovely), testified that the fight lasted about 20-30 seconds. Both inmates Lovely and Griffis testified that it took around 30 seconds before Hawk became aware of the fight and responded to it. This testimony supports the argument that by the time Hawk became aware of the fight, Frash had already received hits to his head and several stab wounds. Furthermore, Hawk's intervention in the fight after becoming aware of it would not have prevented the injuries to Frash's head—the cause of death—which occurred at the beginning of the fight.

(Aug. 16, 2014 Decision.)

{¶ 3} Following his death, the Estate filed a claim in the Court of Claims on March 30, 2011. In the course of discovery, the Estate sought an order compelling ODRC "to turn over all prison and psychiatric records of Inmate Eugene Groves." *Frash v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 13AP-14, 2013-Ohio-2783, ¶ 3. The Court of Claims denied the motion insofar as the motion sought psychiatric or medical records or information beyond material pertaining to Groves' violent or assaultive behavior. *Id.* The Estate twice renewed the motion to compel, and the Court of Claims denied it each time. *Id.* at ¶ 4-5. The Estate attempted to appeal these orders to this court. *Id.* However on July 8, 2013, we dismissed that appeal for want of a final order.

{¶ 4} On March 10, 2014, the Court of Claims held a trial on liability. It entertained post-trial briefing on the merits. Thereafter on August 6, 2014, it issued a written decision and judgment in favor of ODRC. The Estate sought a new trial on grounds that the judgment was not sustained by the weight of the evidence, that it was contrary to law, and that errors of law infected the proceedings, including that the Court

of Claims did not allow the Estate to access or use Groves' complete psychiatric records and refused to review the records in camera.  On October 1, 2014, the Court of Claims denied the motion.

{¶ 5}   The Estate now appeals.

## II.  ASSIGNMENTS OF ERROR

{¶ 6}   The Estate advances three assignments of error:

[I.] THE TRIAL COURT, BASED UPON THE ACCEPTED FACTS, ERRED IN RULING DISCRETIONARY IMMUNITY PROTECTED DEFENDANT-APPELLEE FROM A FAILURE TO PROTECT AND FROM NOT SEPARATING LEVEL 2 AND 3 INMATES.

[II.] THE TRIAL COURT ERRED IN OVERRULING PLAINTIFF-APPELLANT'S MOTION FOR NEW TRIAL, IN FAILING TO RULE ON THE APPLICATION OF THE DUTY TO PROTECT, BOTH FROM THE STATUTORY DUTY, AS WELL AS THE COMMON LAW DUTY, BASED UPON THE COURT'S ACCEPTED FACTS, AS WELL AS ERRONEOUSLY FINDING LACK OF NOTICE.

[III.] THE TRIAL COURT ERRED IN DENYING PLAINTIFF-APPELLANT'S MOTIONS TO COMPEL DISCLOSURE OF THE PSYCHIATRIC RECORDS OF THE ASSAILANT, EUGENE GROVES, AND IN FAILING TO PERFORM AN IN-CAMERA INSPECTION BEFORE SEALING THE RECORDS.

For cogency of discussion, we address these out of order.

## III. DISCUSSION

{¶ 7}   A motion for a new trial under Civ.R. 59(A)(1) should be granted if the trial evidences a departure from the due, orderly, and established mode of proceeding, whereby a party, through no fault of his own, is deprived of some right or benefit otherwise available to him.  *Reeves v. Healy*, 192 Ohio App.3d 769, 2011-Ohio-1487, ¶ 18 (10th Dist.); *Am. Chem. Soc. v. Leadscope, Inc.*, 10th Dist. No. 08AP-1026, 2010-Ohio-2725, ¶ 93.  The decision to grant or deny a new trial, pursuant to Civ.R. 59(A)(1), rests within the trial court's discretion, and an appellate court will not reverse such a decision absent an abuse of that discretion.  *Reeves* at ¶ 18; *Weinstock v. McQuillan*, 10th Dist. No. 09AP-539, 2010-Ohio-1071, ¶ 10; *see also Gill v. Grafton Corr. Inst.*, 10th Dist. No. 10AP-1094, 2011-Ohio-4251, ¶ 33-34.  However, no court has discretion to violate the law. *In re*

*G.D.*, 10th Dist. No. 14AP-801, 2015-Ohio-1969, ¶ 49. Moreover, the Estate has already indicated its intention to argue only legal issues. *See Corbin* at ¶ 5-6. Thus, insofar as we review the law applied by the Court of Claims, our review is de novo. *See, e.g., Dragway 42, L.L.C. v. Kokosing Constr. Co.*, 9th Dist. No. 09CA0073, 2010-Ohio-4657, ¶ 32 (stating that "when the basis of the motion [for a new trial] involves a question of law, the de novo standard of review applies, and when the basis of the motion involves the determination of an issue left to the trial court's discretion, the abuse of discretion standard applies"); *Taylor Bldg. Corp. of Am. v. Benfield*, 117 Ohio St.3d 352, 2008-Ohio-938, ¶ 37 (reviewing questions of law concerning contract terms de novo but affording "great deference" to the factual findings supporting and underlying the legal questions).

## A. Second Assignment of Error – Whether the Duty to Protect was Triggered by Notice of an Impending Attack

{¶ 8} As in most negligence claims, the Estate was required to demonstrate the existence of a duty, a breach of that duty, and an injury proximately caused by the breach. *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77 (1984). ODRC owes inmates a common-law duty of reasonable care and protection from unreasonable risks. *Franks v. Ohio Dept. of Rehab. & Corr.*, 195 Ohio App.3d 114, 2011-Ohio-2048, ¶ 12 (10th Dist.). However the extent of the duty owed depends on the circumstances of the case and the foreseeability of injury. *Id.* at ¶ 13. "[T]he state is not an insurer of inmate safety and owes the duty of ordinary care only to inmates who are foreseeably at risk." *Id.,* quoting *Woods v. Ohio Dept. of Rehab. & Corr.*, 130 Ohio App.3d 742, 745 (10th Dist.1998). "Where as here, one inmate attacks another inmate, actionable negligence arises only where prison officials had adequate notice of an impending attack."[1] *Metcalf v. Ohio Dept.*

---

[1] The Estate cites the dereliction of duty statute, R.C. 2921.44(C)(3), for the proposition that Hawk and ODRC had a duty to prevent or stop the fight between Groves and Frash. Although R.C. 2921.44 is a criminal statute, not a stand-alone civil cause of action, we recognize that "[w]here a legislative enactment imposes upon any person a specific duty for the protection of others, and [a person's] neglect to perform that duty proximately results in injury to such another, [that person] is negligent per se or as a matter of law." *Eisenhuth v. Moneyhon*, 161 Ohio St. 367 (1954), paragraph two of the syllabus; *see DeCosta v. Medina Cty.*, N.D.Ohio No. 1:04cv1118 (May 22, 2006) (R.C. 2921.44 is not a stand-alone civil cause of action). Yet, proof of a violation of R.C. 2921.44(C) requires proof of negligence. R.C. 2921.44(C) ("No officer * * * shall negligently do any of the following."). Thus, the fact that proof of a violation of R.C. 2921.44(C) gives rise to a finding of negligence per se does little to advance the case, because proving negligence is a prerequisite to proving a violation of R.C. 2921.44(C). Moreover R.C. 2921.44(C)(3) does not override other principles of tort law, and foreseeability is still required for liability. *Baker v. State Dept. of Rehab. & Corr.*, 28 Ohio App.3d 99, 100 (10th Dist.1986) (discussing R.C. 2921.44 in tandem with the requirement of notice).

*of Rehab. & Corr.*, 10th Dist. No. 01AP-292, 2002-Ohio-5082, ¶ 11.  This notice may be actual or constructive. *Id.*

{¶ 9}   The Estate has not obtained a transcript and has instead elected to accept the facts determined by the Court of Claims as established.  *Corbin* at ¶ 5-6.  On the topic of notice, we reiterate that the Court of Claims stated:

> The evidence demonstrates that the attack occurred because of and shortly after an interaction between Groves and Frash in the yard. There was no testimony presented that a CO was a witness to that interaction, and there was no prior threat by Groves to Frash directly, only a threat to the dog that Frash was walking. Deputy Warden Jeffrey Lisath (Lisath) also testified that there was no previous notice of altercations or disputes between Groves and Frash. Accordingly, the court finds that the evidence does not demonstrate that defendant had actual notice that the attack was forthcoming.
>
> Plaintiff contends, though, that defendant had constructive notice of the attack because of Groves' history of violence and mental health problems and that defendant failed to protect Frash despite knowing about Groves' violent propensities. However, although Groves had previously attacked fellow inmates prior to being transferred to RCI, Lisath and inmate Griffis testified that Groves was not involved in any prior attacks or fights during his entire time at RCI. Further, records indicate that his last assault while in prison was in 1999, more than ten years before his attack on Frash. Although inmate Maxwell testified that Groves had a reputation in the prison for being a "crazy man," the court finds that there is no evidence to show that defendant or its employees would have reason to know that Groves would attack Frash.

(Aug. 6, 2014 Decision.)  While we are not required by law to accept the legal conclusions drawn by the Court of Claims (that there was neither actual nor constructive notice), the Court of Claims' recitation of the facts leaves little room for disagreement on the issue of actual notice.  Because the Court of Claims concluded as a factual matter that prison officials had no pre-assault knowledge or information that Groves held animosity toward Frash, and it had been over ten years since Groves had assaulted anyone, we agree that ODRC did not have actual notice that an attack by Groves was "impending."  *Metcalf* at ¶ 11.  However, whether ODRC had constructive notice merits further discussion.

{¶ 10} We begin with ODRC's argument (asserted at oral argument) that the Estate was required to show that ODRC had constructive notice that Groves was going to attack M.W. Frash. The question of constructive notice is essential to the question of whether a governmental entity proximately caused injury or death through negligence. *Miller v. Ohio Dept. of Transp.*, 10th Dist. No. 13AP-849, 2014-Ohio-3738, ¶ 30 (court properly adopted a magistrate's decision in favor of decedent's estate administrator in action against the Ohio Department of Transportation ("ODOT"), for truck hitting potholes and causing driver to lose control, resulting in a fatal crash with the decedent's vehicle, because the evidence supported the finding that ODOT's failure to repair the potholes was the sole proximate cause of the injuries, finding that ODOT had constructive notice of the potholes).[2] Therefore:

> "* * * If an injury is the natural and probable consequence of a negligent act and it is such as should have been foreseen in the light of all the attending circumstances, the injury is then the proximate result of the negligence. It is not necessary that the defendant should have anticipated the particular injury. It is sufficient that his act is likely to result in an injury to someone. * * *"

*Walton v. Dept. of Rehab. & Corr.*, 10th Dist. No. 91AP-935 (June 25, 1992), quoting *Cascone v. Herb Kay Co.*, 6 Ohio St.3d 155, 160 (1983); *Mudrich v. Standard Oil Co.*, 153 Ohio St. 31, 39 (1950). If ODRC had constructive notice that Groves would likely attack someone and negligently failed to shield other persons in the prison from him, it is not essential that ODRC know or foresee exactly *whom* Groves would stab.

{¶ 11} We recognize that a prior case from this court has attempted to distinguish the proximate cause inquiry from this question of notice on a basis that notice relates to immunity, while proximate cause relates to liability. *See Elam v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 09AP-714, 2010-Ohio-1225, ¶ 10. However, *Miller,* a later case, appears to have clarified that analysis. Accordingly, we conclude that, just as ODOT " 'is not an insurer of the safety of travelers on its highways' " and "is not liable for damages

---

[2] We recognize that in *Miller* the issue of statutory immunity, pursuant to R.C. 2743.02(A)(1), subject to waiver pursuant to R.C. 2744.02 was at issue, but this argument does not change our use of *Miller* for the purpose of analyzing the relationship of constructive notice to proximate cause, especially in the context of determining the liability of the state for damages for negligence.

caused by hazards on state highways unless ODOT had actual or constructive notice of the hazard and failed to remedy it," neither is ODRC an insurer of prisoner safety against impending attacks unless it had actual or constructive notice of them. (Citations omitted.) *Miller* at ¶ 42. The Court of Claims in *Miller* had determined that the ODOT "was not immune because it had constructive notice of the potholes and a reasonable amount of time to remedy them. However, the issue of constructive notice primarily relates to whether ODOT breached a duty to [the fatally injured victim]." *Miller* at ¶ 30, citing *Kemer v. Ohio Dept. of Transp.*, 10th Dist. No. 09AP-248, 2009-Ohio-5714, ¶ 31 (affirming Court of Claims on other grounds).

{¶ 12} In short, the question of notice is not separate from the question of liability, but it in fact relates to whether the agency or department in question "breached a duty" to the injured person. *Id.* Applying the holding of *Miller* to the case under review, the question of whether ODRC had a duty to protect M.W. Frash and can be held to have proximately caused his injury through negligence in protecting him from the intentional act of Groves, hinges on whether ODRC can be held to have reasonably foreseen the injury, that is, to have had "adequate notice of an impending attack." *Metcalf* at ¶ 11; *Mussivand v. David*, 45 Ohio St.3d 314, 321 (1989) ("in order to establish proximate cause, foreseeability must be found"); *Strother v. Hutchinson*, 67 Ohio St.2d 282, 287 (1981) ("a reasonable foreseeability of injury is considered an element of proximate cause").

{¶ 13} Further, *Elam,* which separates the consideration of notice and proximate cause, can be further distinguished, because that case concerned an inmate with no history of violence toward other inmates, and it was on that basis we concluded ODRC lacked notice of an impending attack (because the injury was not foreseeable). *Id.* at ¶ 8, 10 (noting that the trial court found there was "no evidence that [the intentional tortfeasor inmate] had ever before exhibited violence toward another inmate"). The case now under review is therefore factually distinct in that Groves holds an extensive history of violence toward other inmates apparently resulting from his condition of paranoid schizophrenia.

{¶ 14} In addition, in a prior case where an inmate's condition of paranoid schizophrenia (like Groves) led to injury, but the inmate had not previously been violent toward other inmates, we noted that foreseeability and notice were linked, and we thereby

declined to find that ODRC had notice of or should have foreseen such an attack. *McGuire v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 96API04-444 (Sept. 30, 1996). In *McGuire* we explained:

> While the psychological staff at [the prison] was aware of [the inmate's] condition and knew he had the potential to be dangerous, [his] history and actions prior to the assault simply did not make it foreseeable that he would attack another inmate. [He] had been in prison, mostly in the general population, for over twenty years and before the assault on appellant, had never assaulted anyone.
>
> [The assaulting inmate] is a paranoid schizophrenic. He talks to himself, has delusions and has hallucinations. When [he] did make threats, it was to no one in particular or to anyone in his vicinity. Despite [his] delusional behavior, he generally did fine in population and had never hurt anyone in prison. When [he] deteriorated enough, the experts on the psychological staff put him in isolation. When they concluded he was no longer a threat to himself or anyone else, they released him back into the general population. Given [the inmate's] history, the staff acted reasonably. No prison official had adequate notice of an impending attack.

{¶ 15} However, in another case, *Walton*, we reversed a decision that had shielded ODRC from liability. In that case, the attacking inmate stabbed his cellmate with a kitchen knife stolen from the prison bakery. The attacker, like Groves, had a long and significant history of stabbing and assaulting people, including fellow inmates. *Id.* There was also considerable evidence in the record that knives were unsecured, that the kitchen was unsecured, and that guards left inmates unsupervised around the knives. *Id.* One expert testified that the situation was "a catastrophe waiting to happen." *Id.* We explained our decision to reverse the Court of Claims' judgment that had been rendered in favor of ODRC in part as follows:

> In summary, the state defended on the grounds that constant supervision meant being close by, that the new knife policy, although effective on November 5, 1987, was not required to be implemented at that time or even one month later, that an inmate with a history of knife assaults could reasonably be assigned to kitchen duty, that the door into the area in which knives were being used could reasonably be left open for some indeterminate amount of time, even though the guard near the door was not always required to be present, that there

were no prior kitchen knife stabbings so no reason for concern, and that inmates who are threatened by other inmates have an affirmative duty to report such threats or the prison cannot be responsible if the threats are carried out.

We find appellant produced competent, credible evidence establishing all the elements of her claim for negligence, and that the state's rebuttal of this evidence was both weak and unconvincing.

*Walton*.

{¶ 16} The case now under review is more similar to *Walton* than to *McGuire* or *Elam*. We recognize that, unlike the prison environment in *Walton*, Ross Correctional Institute ("RCI") did not leave knives unattended where dangerous and unstable inmates could obtain them. Nonetheless, even accepting the facts as recited by the Court of Claims, we note a number of problems which, like the problems in *Walton*, made it easier for Groves to carry out his fatal attack.

{¶ 17} The corrections officer who was on duty at the time the attack commenced was an inexperienced relief officer who had started working at RCI only two weeks prior. He did not know the correct phone numbers to call in the event of an emergency which delayed him in his attempt to obtain help. While the Court of Claims credited (and therefore so must we) the testimony by Lieutenant Numberger that the prison block in which Groves was housed was "closed security" level 3, it is undisputed that Hawk testified that he thought the block was level 2. In other words, the guard in charge of the part of the prison where the attack occurred did not know what level of security it actually was and would therefore not have known to apply the appropriately rigorous security procedures.

{¶ 18} In the context of these failings, Groves (like the inmate in *Walton*) has a very extensive history of hurting his fellow inmates and was incarcerated in 1976 for violently injuring and killing other persons. Between 1984 and 1999 Groves participated in five assaults, including stabbing another inmate in the chest with upholstery shears in 1984, stabbing his cellmate in 1988 (resulting in an attempted murder conviction), stabbing two other inmates in 1994 and 1999, and cutting another inmate's face with a can lid in 1996. Additionally, we note that some exhibits from the trial are before this court and add detail to this list of events. In 1988, Groves not only stabbed his cellmate

(as the Court of Claims recounted), he bit off his cellmate's lower lip. In 1994, Groves not only stabbed a fellow inmate in the neck with a shank, but he ignored prison guards' attempts to interfere, and chased the wounded, bleeding victim through the prison, up and down stairs, and even outside before Groves surrendered and was handcuffed. A 1996 report recounts that Groves not only used a can lid to cut another inmate's face (as the Court of Claims' decision mentions) but also suggests that Groves attempted to slice the victim's throat with it and throw him over a prison balcony. The Court of Claims' decision also mentions a 1999 stabbing. However eyewitness accounts by corrections officers add details; significantly, that the stabbing was to the other inmate's face and neck, that the other inmate escaped on his own, and that, had he not done so, Groves would surely have killed him. Even as recently as September 13, 2006, Groves told a female staff member that her life could be taken in a "split second" before help could get to her.

{¶ 19} Taken together, these circumstances bespeak "a catastrophe waiting to happen." *Walton*. While it is true that Groves had not been involved in a physical altercation for approximately a decade, we have previously recognized that persons who suffer from paranoid schizophrenia have periods of relative quiescence and stability as well as periods of deterioration which, if not carefully monitored, can lead to episodic violence. *McGuire*. Moreover, after Groves' last stabbing episode in 1999, he was confined in maximum security conditions for a significant period of time. Thus, it is evident that for many years of the ten-year quiescence period, Groves had fewer opportunities to interact with or stab other people because of the level of security in which he was housed. Under the circumstances, a period of even ten years in which Groves did not assault anyone was not sufficient to dispel the salience of the knowledge possessed by ODRC about Groves' violent and volatile tendencies. We find as a matter of law that, under the circumstances, ODRC had constructive notice that an attack from Groves was, at any moment, impending. ODRC had a duty to protect its employees, visitors, and the inmates it housed from the potential and likely actions of such an inmate.

{¶ 20} The Estate's second assignment of error is sustained.

**B. First Assignment of Error – Whether Discretionary Immunity Shielded ODRC from the Estate's Claims**

{¶ 21} Under the judicially created doctrine of sovereign or discretionary immunity, ODRC is generally immune from tort liability for decisions relating to policies and procedures.[3]  *Franks* at ¶ 14, citing *Hughes v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 09AP-1052, 2010-Ohio-4736, ¶ 16; *Howe v. Jackson Twp. Bd. of Trustees*, 67 Ohio App.3d 159, 162 (6th Dist.1990).  Specifically, the sovereign " ' "cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." ' "  *Franks* at ¶ 14, quoting *Hughes* at ¶ 16, quoting *Reynolds v. State Div. of Parole & Community Servs.*, 14 Ohio St.3d 68 (1984), paragraph one of the syllabus.  The Estate argues that the doctrine of discretionary immunity is inapplicable in this case and that the Court of Claims erred by applying it to deny the Estate's claims.

{¶ 22} In *Bugh v. Grafton Corr. Inst.*, 10th Dist. No. 06AP-454, 2006-Ohio-6641, ¶ 2-5, 25-34, we considered whether decisions made by personnel at a correctional institution should be afforded discretionary immunity.  In that case an inmate alleged that he needed special footwear due to arthritis and injuries to his feet and that the failure to timely provide such had caused him injury.  *Id.* at ¶ 2.  The trial court granted summary judgment to the correctional institution after finding that the institution's decision to transport the inmate for medical care and to provide special boots instead of surgery was characterized by a high degree of judgment or discretion.  *Id.* at ¶ 5.  After reaching this finding, the trial court concluded that the institution's decisions were immune from suit. *Id.*  We reversed because "once the decision has been made to engage in a certain activity or function, the state may be held liable, in the same manner as private parties, for the negligence of the actions of its employees and agents in the performance of such activities."  *Id.* at ¶ 27-29.  We decided a similar case with similar results in *Franks*, where an inmate had been injured by a fall after seeking to be moved to a ground-level cell based

---

[3] ODRC and the Court of Claims relied on the judicially created doctrine, not Chapter 2744 of the Ohio Revised Code which confers tort immunity upon "political subdivisions."  *See* R.C. 2744.02; 2744.01(F).

on a medical condition that made it dangerous and difficult for him to negotiate stairs. *Franks* at ¶ 13-16.

{¶ 23} In other words, when adopting a policy or procedure to "preserve internal order and maintain institutional security" or by acting in accordance with such a policy or procedure, ODRC (as a division of the sovereign) enjoys immunity. *Franks* at ¶ 14; *see also Reynolds* at paragraph one of the syllabus. But that was not the situation argued in this case. The Estate's allegations were that an inexperienced guard, Hawk, acted improperly and fearfully in reacting to a fight and that ODRC violated its policies in deciding to house an unstable and dangerous inmate like Groves in a level 2 area. While we recognize that Hawk, like all implementing employees, must exercise some degree of discretion in carrying out his duties, we have previously explained the problem in finding immunity in these situations: " 'Were we to find that discretionary immunity applies every time a state employee exercises discretion in performing his or her job, we would be vastly expanding the scope of the discretionary immunity doctrine.' " *Miller* at ¶ 32, quoting *Foster v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 12AP-503, 2013-Ohio-912, ¶ 23. Insofar as the Court of Claims applied immunity to claims that are really about negligence in adhering to policies relating to training, supervision, and inmate placement, it erred.

{¶ 24} The Estate's first assignment of error is sustained.

C. **Third Assignment of Error – Whether the Trial Court Erred in Failing to Compel, Admit, and Consider Groves' Full File Including Medical and Psychiatric Records**

{¶ 25} The Court of Claims described its decisions to deny the Estate access and use of Groves' medical and psychiatric records as follows:

> On three separate occasions, plaintiff filed a motion to compel Groves' psychological and medical records, and on all three motions, the court denied the motion because plaintiff did not persuade the court that the documents were not privileged, relevant, or would lead to admissible evidence establishing the necessary elements of plaintiff's cause of action.

(Oct. 1, 2014 Entry, 2.) This incorrectly shifts the defendant's burden to the plaintiff. "The burden of proof rests with the party asserting the existence of privilege." *Shaffer v. OhioHealth Corp.*, 10th Dist. No. 03AP-102, 2004-Ohio-63, ¶ 8. The Court of Claims

erred in ruling against the Estate on grounds that the Estate had failed to carry a burden that was not its to carry.

{¶ 26} Additionally, we acknowledge that communications between a licensed psychologist or physician and a patient are often privileged. R.C. 2317.02(B); 4732.19. But that privilege is not automatic and instead arises only in connection with "communications" made to a care provider by a "patient" and "advice" from that care provider to the "patient." R.C. 2317.02(B)(1). Consistent with the notion of what a patient is in relation to a treating physician or psychologist, courts have recognized that the purpose of this privilege is to " 'create an atmosphere of confidentiality, encouraging the patient to be completely candid and open with his or her physician [or psychologist], thereby enabling more complete treatment.' Otherwise, the fear of disclosure 'could seriously impede the patient's chances for a recovery.' " *In re Wieland*, 89 Ohio St.3d 535, 538-39 (2000), quoting *In re Miller*, 63 Ohio St.3d 99, 107-08 (1992).

{¶ 27} As a corollary, where a communication between a person and a psychologist is made for purposes other than to facilitate diagnosis and treatment (for example determining proper security classification in a prison), the privilege may not attach. *See In re Wieland*, 2d Dist. No. 17646 (July 9, 1999) (remarking that when "[t]he physician is not examining or treating the patient to alleviate medical complaints or substance addictions" and "[i]nstead * * * is performing a forensic evaluation for the purpose of helping the court to determine the best course of action * * * no privilege attaches"); *State v. Conley*, 8th Dist. No. 69597 (Aug. 22, 1996) (privilege does not apply to a medical examination undertaken to produce test results for the purposes of proving a point in controversy in a criminal investigation); *State v. Garrett*, 8 Ohio App.3d 244, 246 (10th Dist.1983) (privilege does not attach to a communication to a doctor by a person seeking a prescription for a controlled substance where there is no evidence that the drug was obtained by said person for the treatment of any medical illness, disease or disorder); *In re Winstead*, 67 Ohio App.2d 111 (9th Dist.1980) (privilege inapplicable to an examination for judicial involuntary commitment procedure); *Ring v. Fox*, 56 Ohio App.2d 235 (2d Dist.1977) (privilege does not apply to an examination for purposes of job promotion).

{¶ 28} Moreover, as to questions of whether material is relevant and discoverable, this court has previously stated:

> Matters are only irrelevant at the discovery stage when the information sought will not reasonably lead to the discovery of admissible evidence. [*Covington v. MetroHealth Sys.*, 150 Ohio App.3d 558, 2002-Ohio-6629, ¶ 23 (10th Dist.)]; *Dehlendorf v. Ritchey*, 10th Dist. No. 12AP-87, 2012-Ohio-5193, ¶ 20. The party resisting discovery bears the burden of demonstrating to the trial court that the requested information would *not* meet this standard. *Bennett v. Martin*, 186 Ohio App.3d 412, 2009-Ohio-6195, ¶ 44 (10th Dist.).

(Emphasis added.)   *Union Sav. Bank v. Schaefer*, 10th Dist. No. 13AP-222, 2013-Ohio-5704, ¶ 46.  Some of the key questions in the case were whether the injury to M.W. Frash by Groves was foreseeable and whether ODRC was negligent in protecting M.W. Frash from Groves.  Evidence as to Groves' mental state leading up to the attack and Groves' psychiatric condition and propensity for violence are discoverable absent ODRC demonstrating that they should not be subject to discovery for whatever reason it posited.

{¶ 29} We finally note that the Court of Claims declined to make an in camera inspection of the records being challenged.  The Court of Claims should not have placed the burden of proving relevance and disproving privilege on the Estate (which did not have access to the records).  Moreover, it should have performed an in camera inspection before ruling that the records were privileged and irrelevant without knowing for what purpose the records had been made.

{¶ 30} The Estate's third assignment of error is sustained.

## IV.  CONCLUSION

{¶ 31} We sustain all three of the Estate's assignments of error.  The decision of the Court of Claims of Ohio is reversed, and the case is remanded for a new trial consistent with this decision.  The Court of Claims is specifically instructed that it shall reconsider ODRC's claims of privilege and irrelevance, properly putting the initial burden upon ODRC to establish the same, and determine if necessary, with an in camera inspection, whether the challenged medical and psychological records should be provided and admitted in the new trial.

*Judgment reversed;*
*and cause remanded with instructions.*

TYACK, J., concurs.
DORRIAN, P.J., concurs in part and dissents in part.

DORRIAN, P.J., concurring in part and dissenting in part.

{¶ 32} I concur with the majority that the Court of Claims erred in not conducting an in camera inspection of Groves' medical records. Accordingly, I would sustain the third assignment of error.

{¶ 33} I concur in judgment only with the majority that the Court of Claims erred in not considering whether ODRC was negligent in performing and adhering to its own policies. Accordingly, I would sustain the first assignment of error.

{¶ 34} I respectfully dissent from the majority and its blending of the elements of constructive notice and proximate cause. I do not construe *Miller v. Ohio Dept. of Transp.*, 10th Dist. No. 13AP-849, 2014-Ohio-3738, as the majority does. I would follow our instruction in *Elam v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 09AP-714, 2010-Ohio-1225, ¶ 10, that in proving the elements of a wrongful death suit, notice of an attack is a "separate and distinct" requirement from proximate cause. Accordingly, I would overrule the second assignment of error.

_____