[Cite as *Current v. Dept. of Rehab. & Corr.*, 2018-Ohio-1500.]

| | |
|---|---|
| TERRY CURRENT | Case No. 2016-00488JD |
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| OHIO DEPARTMENT OF REHABILITATION AND CORRECTION | |
| Defendant | |

**{¶1}** Plaintiff brings this action claiming that when he was incarcerated in defendant's custody and control at London Correctional Institution (LCI), another inmate attacked and injured him on March 25, 2011, due to the negligence of defendant. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

**{¶2}** At trial, plaintiff testified that in 2006 he and his nephew Tommy Scott were incarcerated in the same housing unit at LCI. According to plaintiff, another inmate in the housing unit, Joseph Rosebrook, was in prison for attempting to have Scott's father killed, and he had a list of other people whom he wanted to have killed and he spoke of hiring a hitman. Plaintiff stated that one name on Rosebrook's list was a man named Dan Ott. Plaintiff testified that he and Rosebrook were among a group of inmates watching a television news show one day when a story aired about the homicide of a man in Geauga County named Dan Ott. According to plaintiff, this was not the man on Rosebrook's list, and Rosebrook exclaimed that "they killed the wrong S.O.B."

**{¶3}** Plaintiff related that when this happened, he had been sharing information with Detective Keith Levan of the Logan County Sheriff's Office about a separate murder investigation. Plaintiff stated that he subsequently began sharing information about Rosebrook and Ott with both Levan and Detective Juanita Vetter of the Geauga County Sheriff's Office. Plaintiff stated that the LCI Investigator at the time, Marty

Dillard, and the then-Assistant Investigator, Matthew Crisler, helped arrange interviews and communications with Vetter, and he remembered Dillard sitting in on one or more interviews. Plaintiff testified that he was told, apparently by Dillard, that if he was ever concerned for his safety he could notify the captain's office or any staff member and ask to be put in protective control.

{¶4} Plaintiff stated that defendant released him from LCI in 2007 after he served out his sentence. Plaintiff related that he was on post-release control afterward and stayed in touch with Levan. According to plaintiff, stories about Rosebrook and the killing of Ott later appeared in the news media and named him as an informant. About six months after his name appeared in the news, plaintiff stated, he was arrested on new criminal charges for which he was eventually sentenced to a four-year prison term.

{¶5} Plaintiff testified that on January 22, 2010, he started serving his sentence at defendant's Correctional Reception Center (CRC). Plaintiff recounted explaining to an employee there, Classification Specialist Amy Robie, that he would feel unsafe at LCI due to his history both with Rosebrook and with another man he served time with there named Carl Simons. A memo prepared by Robie documented that plaintiff told her he needed to be separated from Simons, whom plaintiff stated that he had testified against in Champaign County, and Robie noted that Simons was in the custody of Champaign County at that time. (Plaintiff's Exhibit 2.)

{¶6} Nine days after plaintiff's arrival at CRC defendant placed him at LCI, he testified. According to plaintiff, at LCI he was assigned to the same housing unit as an inmate named Chad South who had been at LCI during part of plaintiff's prior prison term. Plaintiff stated that he suspected, and later learned from South himself, that South was the hitman responsible for Ott's death. Plaintiff stated that after South confided in him, he shared the information with Crisler. Plaintiff testified that Crisler asked if he felt that South posed a danger to him and that he said no, but that he told Crisler he was worried about Rosebrook arranging an attack upon him. It was plaintiff's

testimony that he felt Rosebrook had the ability to arrange from another institution to have an attack carried out on him "through the prison grapevine." Plaintiff related that at no time during his second term at LCI were either Rosebrook or Simons there. Nevertheless, plaintiff stated, as soon as he arrived inmates called him a snitch. Plaintiff also stated that when a telephone rang one day, a lieutenant joked that plaintiff should answer because the call was probably for him. Plaintiff stated that within ten days of his arrival LCI, an inmate named J. Farr attacked him, and he felt that this was due to his being an informant.

{¶7} Plaintiff recounted that he was later transported to the Champaign County jail where he remained for a month or more so he could testify in Simons' criminal case. Vetter came to see him at the jail to talk about South and the Ott homicide, plaintiff stated. From plaintiff's testimony, they apparently agreed that upon his return to LCI he would not seek to transfer out of there until South's sentence expired.

{¶8} Plaintiff stated that less than two weeks after he returned from the jail to LCI, an inmate named Weber attacked him on February 12, 2011. According to plaintiff, he felt that this was due to his reputation as an informant. Plaintiff admitted, however, that when he appeared before the Rules Infraction Board (RIB) on a charge of fighting Weber, he pleaded guilty and his recorded testimony made no reference to that theory nor gave any indication that he felt he was in danger leading up to that altercation or in the future. (Defendant's Exhibit B.) Plaintiff insisted that he told the RIB about Rosebrook and Simons and expressed concern for his safety, but that these statements must have been ignored, and he also suggested that his written testimony had been tampered with.

{¶9} Plaintiff testified that a Separation Order was issued to keep him and Weber apart (Plaintiff's Exhibit 6), that the RIB ordered him to serve 15 days in the segregation unit for fighting Weber, and that while he was there he wrote a kite to Crisler. Crisler then met with him, plaintiff stated, and told him that he would be safe in segregation and

that if he ever felt unsafe he was to tell any staff member that he needed to see Crisler. Plaintiff admitted that when the 15 days were up, he could have refused to leave segregation if he feared for his safety, but that he instead reentered the general population. Plaintiff explained that he did not want to stay in segregation because he would not have access to the commissary or enjoy other privileges, he felt safer in the general population, and segregation is an undesirable place where inmates are sent to be punished. Plaintiff stated that he later telephoned Vetter and told her there was no more information for him to provide, and that at some point afterward Crisler met him again and asked if he felt threatened. Plaintiff stated that Crisler told him he could contact any staff member if he did feel threatened, and that Crisler would have him transferred out of LCI.

{¶10} Later on, plaintiff stated, he observed a document posted on a bulletin board in the LCI law library, being a narrative report from the City of Urbana Police Division regarding information plaintiff shared with that agency about purported criminal activity involving Simons. (Plaintiff's Exhibit 5.) Plaintiff explained that he seized the document and did some investigating which led him to believe that Simons, despite being at another prison, was responsible for the posting of the document and meant for some harm to be done to plaintiff. Plaintiff stated that he shared this belief, along with what he felt was supporting documentation (Plaintiff's Exhibits 3 & 4), with Mark Harper, who plaintiff described as either a unit manager or case manager, and he stated that he also told Harper he wanted out of LCI. According to plaintiff, Harper said he could either put plaintiff in segregation immediately or seek a transfer for plaintiff. Plaintiff explained that he did not want to go to segregation and that Harper thus told him to give him some time to look into getting plaintiff transferred, but Harper's employment ended suddenly and plaintiff got no response. Plaintiff stated that he could not recall if he followed up with the individual whom he understood to have taken over Harper's job, Kenneth Berry.

{¶11} Plaintiff testified that on March 25, 2011, he was buying fudge from another inmate in his housing unit when an attacker came up and punched him. By plaintiff's description, the attacker was an African American inmate wearing a hood and was accompanied by some young inmates, possibly gang members, from other housing units. Plaintiff recounted that his vision went bleary, and when he "came to" he was dizzy and another inmate helped him to the restroom. Plaintiff related that he left the dormitory, falsely telling the corrections officer there that he fell and hit his head on the sink. Plaintiff stated that he went to the infirmary and told Corrections Officer John Burke what happened. Plaintiff testified that a captain got involved and began escorting him to segregation, but he fell and was then transported to defendant's medical center in Columbus. Plaintiff recalled that upon returning to LCI, he was placed in segregation and Berry came to talk to him about going into protective control. Plaintiff stated that Berry gave him documentation to request protective control, which he signed on April 8, 2011. (Defendant's Exhibit C.) Plaintiff acknowledged that he never previously submitted such a request.

{¶12} Alice Hauser, plaintiff's sister, testified that she was concerned for plaintiff's safety due to his activities as an informant, particularly in the Rosebrook matter. Hauser stated that after the March 25, 2011 attack she spoke with prison officials and sent letters expressing her concern, but in terms of what, if anything, she did before the attack to relay such concerns, she only vaguely recalled a conversation with an unknown person on an unidentified date. The only employee of defendant whom she specifically remembered speaking to at any point was Crisler.

{¶13} Juanita Vetter testified that she is now retired from the Geauga County Sheriff's Office, where she spent the last 13 years of her career as a detective. Vetter testified that she investigated the Ott homicide and that Detective Levan from Logan County also investigated the case because the crime had a connection in that jurisdiction. Vetter explained that the investigation eventually centered upon Rosebrook

and involved other inmates at LCI, including plaintiff, with whom she had some limited contact during his first prison term. Vetter testified that before communicating with plaintiff, she contacted LCI and coordinated with Crisler, explaining to him why she wanted to speak with plaintiff.

{¶14} Vetter did not recall having contact with plaintiff as a civilian after his first prison term. But after learning in early 2010 that plaintiff had reoffended and returned to LCI, Vetter stated, she reconnected with him and apprised Crisler. According to Vetter, she believes she set up a meeting with plaintiff during his second prison term, but that Levan had more contact with plaintiff than she did, and she explained that plaintiff was only one of several inmates at LCI who were involved in the investigation and that he did not testify at Rosebrook's trial. Plaintiff never expressed any concern to her about being in danger, Vetter stated. Vetter, who testified that she spoke with Crisler several times between 2010 and 2011, stated that she likewise expressed no such concern about plaintiff to Crisler prior to the March 25, 2011 attack. Vetter stated that she did write an email to Crisler on April 4, 2011, after the attack, in which she said she believed plaintiff was in some danger due to his work as an informant and that her office was requesting that he be transferred to another prison. (Plaintiff's Exhibit 1.) Vetter explained that she wrote the email after being contacted by plaintiff's sister.

{¶15} Corrections Officer John Burke testified that he has been employed with defendant for 14 years at LCI. Burke stated that on March 25, 2011, he saw plaintiff walk out of the prison yard with a black eye and broken eyeglasses. Burke related that he escorted plaintiff into the infirmary and that when he asked what happened, plaintiff said he had slipped. According to Burke, plaintiff never said another inmate struck him. Burke testified that he understood plaintiff was transported to defendant's Franklin Medical Center in Columbus for treatment of his injuries. Burke also recalled that during plaintiff's second term at LCI, between 2010 and 2011, plaintiff gave him reliable tips about other inmates making hooch and having drugs smuggled into the prison.

{¶16} Investigator Matthew Crisler testified that he has been employed with defendant at LCI since 1994, and that before assuming his current job in 2007 or 2008 upon Dillard's retirement from the post, he was the assistant investigator. Crisler recalled assisting law enforcement from Geauga County with their investigation, including setting up a meeting in his office between them and plaintiff, after which the authorities told him that plaintiff would be assisting them. Crisler stated that before plaintiff left his office that day, he told plaintiff that if he ever felt his safety was in jeopardy, he was to contact Crisler, or if Crisler was unavailable, the captain or other correctional staff. Crisler, who testified that neither plaintiff nor anyone else told him that plaintiff was in danger before the March 25, 2011 attack, explained that if an inmate did raise such concerns, the protocol was to place the inmate in segregation and open a protective control investigation. But Crisler was adamant that plaintiff never told him he feared for his safety. Crisler stated that plaintiff's sister did telephone him sometime during plaintiff's first term at LCI, but from his recollection she was concerned about her son who was there.

{¶17} Crisler recalled that it was not long before the March 25, 2011 attack when he learned plaintiff had returned to LCI. Crisler acknowledged receiving Vetter's April 4, 2011 email in which she expressed concern for plaintiff's safety and asked that he be transferred elsewhere, but he testified that despite talking to Vetter frequently over the course of her investigation she never raised such concerns before the attack. Crisler recounted that Vetter called him a number of times to request information and that she would also call him when she wanted to set up an appointment with plaintiff.

{¶18} Kenneth Berry testified that he has been employed with defendant for 20 years and that his main role since December 2010 has been that of Unit Manager, overseeing all operations in "C Unit," comprised of approximately 550 inmates and several staff members. According to Berry, plaintiff lived in C Unit when he became Unit Manager but he did not know that plaintiff was aiding law enforcement prior to the

March 25, 2011 attack. Berry explained that when law enforcement speaks with an inmate, he does not necessarily know about it. Berry related that plaintiff never told him before the attack that he was concerned for his safety, and that he never heard anyone threaten plaintiff. When an inmate comes to staff saying that his safety is in jeopardy, ordinarily a protective control investigation is performed, Berry stated. As Berry explained, an inmate may to go to any staff member at any time with such concerns. If an inmate does so, Berry stated, the inmate is placed in segregation, a statement is taken from the inmate, the inmate is interviewed, and the allegations are then investigated. Berry stated that the segregation unit is the most secure housing at LCI, and that while there are some two-man cells there, any inmate undergoing a protective control investigation is placed in a solitary cell.

{¶19} Berry, who explained that he is responsible for protective control investigations for inmates in his unit, testified that sometime after learning of the March 25, 2011 attack, he spoke to plaintiff in the segregation unit and plaintiff said he was concerned for his safety. Berry stated that plaintiff signed a document requesting protective control and gave a statement in which he noted his involvement in the Rosebrook and Simons matters and asserted that "they together put a hit on me with the Triple CCC Gang here at London." (Defendant's Exhibit C.) Berry stated that he then interviewed plaintiff and made a written version of the interview from a recording. (Defendant's Exhibit E.) As Berry noted, plaintiff said "no" when asked whether anyone had threatened him. As Berry also noted, plaintiff said he had separation orders for Rosebrook and Simons, and Berry stated that he confirmed this on defendant's tracking system.

{¶20} "To establish negligence, a plaintiff must show the existence of a duty, a breach of that duty, and injury resulting proximately therefrom." *Taylor v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 11AP-1156, 2012-Ohio-4792, ¶ 15. "In the context of a custodial relationship between the state and its prisoners, the state owes a

common-law duty of reasonable care and protection from unreasonable risks." *Jenkins v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 12AP-787, 2013-Ohio-5106, ¶ 8. "The state's duty of reasonable care does not render it an insurer of inmate safety." *Allen v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 14AP-619, 2015-Ohio-383, ¶ 17, citing *Williams v. S. Ohio Corr. Facility*, 67 Ohio App.3d 517, 526 (10th Dist.1990). Inmates are also required to use reasonable care to ensure their own safety. *Feathers v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 16AP-588, 2017-Ohio-8179, ¶ 18. "Reasonable care is defined as the degree of caution and foresight that an ordinarily prudent person would employ in similar circumstances." *Phelps v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 16AP-70, 2016-Ohio-5155, ¶ 12.

{¶21} "Where one inmate attacks another inmate, actionable negligence arises only when there was adequate notice of an impending attack." *Lucero v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 11AP-288, 2011-Ohio-6388, ¶ 18. "Notice may be actual or constructive, the distinction being the manner in which the notice is obtained rather than the amount of information obtained." *Watson v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 11AP-606, 2012-Ohio-1017, ¶ 9. "Whenever the trier of fact is entitled to find from competent evidence that information was personally communicated to or received by the party, the notice is actual. Constructive notice is that notice which the law regards as sufficient to give notice and is regarded as a substitute for actual notice." *Hughes v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 09AP-1052, 2010-Ohio-4736, ¶ 14.

{¶22} Upon review of the evidence presented at trial, the magistrate finds as follows. Plaintiff was initially incarcerated at LCI for a term that ended in 2007. During that time, plaintiff was an informant on multiple criminal matters for law enforcement agencies, including the Logan County and Geauga County Sheriffs' Offices. One of those matters was the murder-for-hire investigation involving Rosebrook, in which

plaintiff was one of several inmates who participated. After his release from LCI, plaintiff reoffended and returned to defendant's custody in January 2010. Although plaintiff contends that news reports during his time out of prison named him as an informant, he failed to substantiate this with any demonstrative evidence and it was not shown that other inmates knew of such reports. At the time plaintiff returned to prison, he was cooperating with law enforcement authorities in Champaign County to provide incriminating information against Simons. Plaintiff went through a screening process at CRC to determine whether there were inmates from whom he needed to be separated. The employee who interviewed plaintiff noted that he needed to be separated from Simons, who was then in the custody of Champaign County, and ultimately defendant made orders to keep plaintiff separated from both Simons and Rosebrook, neither of whom was ever in the same prison as plaintiff during his second prison term.

{¶23} Following plaintiff's reception at CRC, he was placed at LCI, where he subsequently obtained incriminating information against South and shared it with Vetter, reconnecting with her for the first time since 2007. Plaintiff also continued to cooperate with Champaign County authorities on the Simons matter. And, plaintiff acted as an informant within the prison, sharing tips about inmate misconduct. Plaintiff temporarily left LCI for the Champaign County jail to appear in court there in the Simons matter, and while at the jail he met with Vetter and agreed that upon his return to LCI he would not seek a transfer elsewhere until later, when South was supposed to leave.

{¶24} On February 12, 2011, approximately two weeks after plaintiff returned to LCI from the jail, he was in an altercation with inmate Weber. Plaintiff pleaded guilty at the RIB of fighting with Weber, and his signed, written testimony before the RIB provided that the altercation resulted from plaintiff refusing to sell Weber a pair of shower shoes. Plaintiff spent 15 days in segregation for fighting. At the conclusion of the 15 days, plaintiff had the opportunity to stay in segregation and seek protective control if he felt unsafe, but he did not do so. Indeed, plaintiff had the opportunity at any

time while he was at LCI to tell any staff member that he felt his safety was in jeopardy and that he wanted to be placed in protective control, but he did not do so. On March 25, 2011, plaintiff was attacked by an unidentified inmate who was accompanied by other unidentified inmates. Plaintiff offered no evidence about anything the inmate or his accomplices said or did that would suggest a motive. There is no direct evidence that the attack was related to plaintiff's work as an informant against Rosebrook or anyone else. After the attack, plaintiff lied about the cause of his injuries to the corrections officer stationed in his housing unit and to Corrections Officer Burke, still giving no indication to the staff that he was in danger.

{¶25} The evidence does not demonstrate that defendant had sufficient notice to be liable for plaintiff's injuries from the March 25, 2011 attack. Plaintiff's contention that he told employees that his presence at LCI posed a danger to him is belied by other evidence and lacks credibility. There is no record of such concerns in the RIB documentation—including plaintiff's signed testimony—pertaining to the altercation with Weber, nor in the memorandum prepared upon his admission to CRC, nor in any institutional kites or grievances that plaintiff had the opportunity to file, and plaintiff admittedly has "bad memory problems." Considering that plaintiff initially gave a false story and failed to identify what he felt was the reason for the March 25, 2011 attack, it is all the more unlikely that he would have divulged those feelings after the earlier, less serious altercations. Plaintiff argues that the earlier altercations put defendant on notice that he was being targeted for being an informant, but that is simply not what he told prison officials at the time and those officials did not have reason to know of an impending attack upon plaintiff from his mere involvement in those altercations. Plaintiff repeatedly stated at trial that his concerns just "fell on deaf ears," but the more probable explanation is that he did not raise such concerns until after the attack. Consistent with that, when Berry interviewed plaintiff after the attack plaintiff told Berry that he had not been threatened beforehand.

{¶26} Had plaintiff truly been so concerned for his safety due to his activities as an informant, it seems improbable that he would have continued informing, even against the very inmates with whom he was incarcerated, during his second prison term at LCI. Indeed, during his time in the Champaign County jail that ended in early 2011 he even told Vetter that he would not seek a transfer out of LCI until several months later when South was scheduled to leave, which shows that he did not believe he was endangered. Beyond a lack of safety concerns, plaintiff was disinclined to enter protective control because the accommodations were not as nice and he would have fewer privileges. But, plaintiff had a duty to look out for his own well-being and the protective control cells were the safest place in the prison, and if a reasonable person truly felt that his or her safety was imperiled to the degree plaintiff now claims, minor inconveniences would not stand in the way of seeking protection.

{¶27} Plaintiff was clearly informed from the outset of his cooperation in the Rosebrook matter that if he ever felt in danger, he simply needed to notify the investigator or other staff. Plaintiff admitted being told several times over the years how to get help if he needed it and that staff asked on multiple occasions if he felt threatened. Crisler credibly testified, though, that he never knew of plaintiff having any such concern about his safety before the March 25, 2011 attack. It was only afterward that plaintiff expressed such concern, when he spoke to Berry and requested protective control. It was also not until afterward that plaintiff had his sister and Vetter contact the prison on his behalf to request that he be moved out of LCI. Vetter, who understood that informants can be at risk, was never told that plaintiff feared for his safety until after the attack, and it appears that neither she nor Levan expressed any such concern to prison authorities before the attack.

{¶28} While prison officials knew of plaintiff's work as informant, that knowledge alone did not equate to notice of an impending attack on plaintiff, and they were sensitive to keeping plaintiff safe. It was made clear to plaintiff how he could obtain

protection if he ever found himself in danger, and Crisler took steps to keep other inmates from knowing about plaintiff's meetings with law enforcement.  Defendant also had separation orders in place to prevent plaintiff from being in the same prison as Rosebrook or Simons.  While plaintiff remained at LCI with South there as well, it was plaintiff's choice to inform on South and to remain at LCI for the duration of South's time there without notifying defendant that he was in danger, there is no evidence that South knew plaintiff was informing on him, and defendant had no reason to believe that having plaintiff and South at the same institution posed a danger to plaintiff.  Similarly, plaintiff chose on his own accord to inform on other inmates' drug and alcohol activities within the prison, and defendant had no reason to believe that this posed a danger to plaintiff.

{¶29} To the extent plaintiff asserts that it was common knowledge among inmates that he was an informant, his testimony about this was vague and he could not name a single inmate who supposedly called him a snitch, nor did he describe a single threat ever made to him by another inmate at LCI.  Plaintiff contends that the document that he found posted on the bulletin board in the law library shows that he was in danger, and that information he obtained subsequently led him to believe that Simons was responsible for it and sought reprisal against him, but it was not established that any staff observed the document posted to the bulletin board, and even if plaintiff spoke with Harper about it later, Harper was cooperative and offered plaintiff protective control placement but plaintiff declined, which shows again that plaintiff did not expect an impending attack.  Even if Harper had nevertheless offered to look into a transfer for plaintiff, Harper's employment ended very soon thereafter and plaintiff did not follow up to share concern about his safety with any other staff, which still shows that plaintiff was not in fear of an impending attack.  Moreover, if it were true like plaintiff claims that Rosebrook or others could arrange from another prison to have him attacked, the evidence fails to show how he would have been any safer by merely transferring out of LCI as opposed to entering protective control.

{¶30} Plaintiff compares the facts of this case to those in *Brooks v. Dept. of Rehab. & Corr.*, Ct. of Cl. No. 2012-06181 (Apr. 21, 2015), adopted at 2015-Ohio-5629. In *Brooks*, defendant was liable for an attack upon an inmate (Brooks) who had been an informant for the Akron Police Department and was attacked by a cellmate from Akron. Before the attack, however, inmates threatened Brooks and he notified the institutional inspector that he was concerned for his safety, and he identified the inmate who later attacked him. Prison authorities opened a protective control investigation, placed Brooks in segregation, and noted that Brooks should not be celled with inmates from Akron. Nevertheless, defendant inexplicably placed the attacker in plaintiff's cell.

{¶31} In contrast, in this case plaintiff was not directly threatened by other inmates, he did not tell prison authorities he was in danger, he did not identify to prison authorities any other inmates at LCI who posed a threat to his safety, and he declined to enter protective control. Rather than *Brooks*, the facts of this case are more like those in *Layne v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 00AP-724, 2001 Ohio App. LEXIS 1887 (Apr. 26, 2001). In *Layne*, defendant was not liable for injuries inflicted upon an inmate (Layne) by an unknown attacker. Layne claimed that the attack occurred due to his reputation as a snitch, but he was never directly threatened, he refused to be transferred or to file complaints or grievances, he did not ask staff for protection, and he did not anticipate the attacked when it occurred. It was noted that an inmate has a responsibility to exercise reasonable care to protect himself, which included a duty to cooperate with prison officials, but Layne "refused to take advantage or pursue any of the options offered by the defendant to ensure his safety." Plaintiff argues that *Layne* would be decided differently today following the Tenth District Court of Appeals' decision in *Frash v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 14AP-932, 2016-Ohio-360, but *Frash* did not change the law regarding constructive notice. *Literal v. Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 16AP-242, 2016-Ohio-

8536, ¶ 30, citing *Frash v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 14AP-932, 2016-Ohio-3134, ¶ 11, 13 (*"Frash II"*).

{¶32} In conclusion, defendant did not have adequate notice of the March 25, 2011 attack upon plaintiff and therefore cannot be liable for his injuries.

{¶33} Based on the foregoing, the magistrate finds that plaintiff failed to prove his claims by a preponderance of the evidence. Accordingly, judgment is recommended in favor of defendant.

{¶34} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

ROBERT VAN SCHOYCK
Magistrate

cc:

Richard F Swope
6480 East Main Street Suite 102
Reynoldsburg OH 43068

Timothy M Miller
Amy S Brown
Assistant Attorneys General
150 East Gay Street 18th Floor
Columbus OH 43215-3130

**Filed March 20, 2018**
**Sent to S.C. Reporter 4/19/18**